GREENWOOD *v.* STATE.

Opinion delivered April 21, 1913.

1. CRIMINAL LAW—CONFESSION—APPEAL—CONCLUSIVENESS OF FINDINGS OF COURT.—Where a trial judge finds that the testimony of defendant is not true and admitted his confession in evidence, his finding will be held conclusive on appeal, unless it appears that the trial court abused its discretion, and that the confession is fairly traceable to prohibited influences.  (Page 577.)

2. CRIMINAL LAW—CONFESSION.—A confession of guilt, to be admissible, must be free from the taint of official inducement proceeding from either defendant's hope or fear; and a confession to be admissible must be voluntary and made in the absence of threat of injury or promise of reward, and made in the absence of any influence which might swerve him from the truth.  (Page 577.)

3. CRIMINAL LAW—VOLUNTARY CONFESSION.—Where a confession is obtained from defendant by persistent questioning by officers, but without deception, threat, hope of reward or inducement of any kind, it is admissible as a voluntary confession.  (Page 578.)

4. TRIAL—CRIMINAL LAW—PRACTICE.—Where the prosecution offers in evidence a confession of the defendant, the approved practice is to withdraw the jury while the court hears evidence to determine whether or not the confession is admissible.  (Page 579.)

5. TRIAL—CRIMINAL LAW—HARMLESS ERROR.—When the confession of the defendant is admitted in evidence, the error of the court, in failing to withdraw the jury while it heard evidence to determine whether to admit the confession, is harmless. (Page 579.)

6. CRIMINAL LAW—CONFESSION—CORROBORATION.—In order to sustain a conviction for murder on a confession, unless made in open court, or accompanied with other proof that such offense was committed, there must be independent evidence to establish that the crime was actually committed by some one. (Page 581.)

Appeal from Pulaski Circuit Court, First Division; *Robert J. Lea,* Judge; affirmed.

### STATEMENT BY THE COURT.

Elijah Greenwood was indicted for the crime of murder in the first degree charged to have been committed by killing Alice Turner. The testimony on the part of the State is substantially as follows:

On the 29th day of November, 1912, some boys were hunting near Sweet Home, in Pulaski County, Arkansas, and, as they say, between 1 and 2 o'clock in the daytime they found the body of Alice Turner, who had been recently killed. Her body had been dragged from a path through a fence and from six to eight feet into the woods. A physician examined her body and found a gunshot wound right in the middle of the back of her skull, just above the neck. Her skin and hair around the wound were powder-burned and the entire charge was inside the skull. The physician said that death was probably instantaneous. He exhibited some gun wads that he took from her skull and stated that they were the same size as a twelve-gauge gun wad. The body was still warm when it was examined. A deputy sheriff picked up an empty gun shell which was lying near the body. It was a twelve-guage shell and was marked "new chief." There were signs of a struggle in the path and a considerable amount of blood was found there. The husband of the deceased testified that she had eighty-six dollars which she was accustomed to carrying in a purse in her corset. Her money and purse were missing when her body was found. He said he was noti-

fied of her death between 12 and 1 o'clock in the day time. The daughter of the deceased testified that her mother left home between 10 and 11 o'clock in the morning to go over to Mrs. Pearson's about half a mile distance. Her body was found in about three hundred yards of Pearson's house.

W. A. Pearson testified: On the 29th day of November, 1912, my wife and I went over to the depot near our house and took the train for Little Rock about 10:30 o'clock in the morning. Our purpose in going there was to make a payment on a lot which we had bought from the Southern Trust Company. We made the payment and transacted some other business and got back home about 4 o'clock in the afternoon. When I got home my back door was broken open, my shotgun was gone and also a ten-pound bucket of lard, which had never been opened. My gun had my name on it. I also missed three gun shells.

The testimony of the wife of W. A. Pearson was substantially the same, and other witnesses testified that they saw them take the train about 10:30 o'clock in the morning on the day that Alice Turner was killed and that neither of them had a gun. An accountant for the Southern Trust Company testified that Pearson came into the Southern Trust Company and paid $46.50 on the day in question. The daughter of the deceased testified that they can hear the train stop and when it goes through from their house. That her mother did not leave home on the day she was killed until after the 10 o'clock train for Little Rock had gone by.

J. G. Shooks testified: I run a sawmill about three or four miles from the place where Alice Turner was killed. I remember the day she was killed, and on that morning about 9 or 10 o'clock I met the defendant, and straight through from the house at which I met him to the scene of the killing was about a mile and a half or two miles.

W. F. Hobbs, deputy sheriff, testified that he was born and raised in that neighborhood and that from the

house Shooks was talking about where he met the defendant to where the killing occurred was about half a mile straight through. A second-hand store keeper at Sixth and Center streets, in the city of Little Rock, testified that he bought a shotgun from the defendant about 2 o'clock in the afternoon of the day that Alice Turner was killed. That he was not acquainted with the defendant but the defendant gave his name as W. A. Pearson and that name was on the gun. That the defendant limped a little when he went out. That the defendant was accompanied by another man. (Here W. A. Pearson is presented to the witness and witness testified that he was not the man who was with the defendant.) That the defendant at the time had a rabbit with him. The gun is exhibited to the witness who identifies it. Another witness for the State testified that about 2 o'clock p. m. on the day of the killing the defendant sold a rabbit to a bartender in his presence. After having proved by the officers that the defendant voluntarily and of his own free will made confessions, W. H. Hobbs, one of the officers who was investigating the crime, testified:

Down at the city hall the negro said: "Mr. Hobbs, I will tell you everything; I have known you longer than any of the rest of the people here; I had rather tell you." He got down on his knees in front of me, and put his hands on my knee. I was sitting on a little stool. I said, "All right, commence." This is his language, as far as I can remember: "I went in Pearson's house, broke open the back door, went in and got a shotgun, and picked up some shells, I don't remember how many. I come out of the house, and come on down the path and met the Turner woman; I spoke to her. We sat down on the root of a little tree, where the rain had washed the dirt off the root. She had a lunch; I helped her eat her lunch. I then made a proposition to her, and offered her $1; I asked her for some, and she told me that she did not have to do it that cheap; that she had plenty of money, and she pulled out and showed me some money. I grabbed a $10 bill. We got to scuffling over the money,

and I made up my mind to get it all. I grabbed it all, and stepped off and shot her. She hollored, 'Oh, Lordy, you shot me.' I broke and run; went through the woods, across the pike, went out by a spring, what we used to call Neuly Spring, down there at Lindsay's Park. Walked up the railroad track to Abeles mill, at the foot of Seventeenth street, and walked from there to Sixth and Center, and sold the gun to a pawnbroker.''

He said he stopped at Sixth and Center, and bought a rabbit out of a wagon, stepped in and sold the gun to a pawnbroker and went from there down to Second and Scott, and sold the rabbit to a negro porter in a saloon there. He said that he got $51; he said he took the money home, and put it in the corner of the house, behind a table leg, in the kitchen, and set a quart bottle up against it. He said it was in a tobacco sack. I asked him if the money was there then, and he said it was. We went down in an automobile and found the table exactly like he said, and a quart bottle sitting by the table leg in the corner, but the money was not there. The statement he made to me was without promises, threats, coercion, and made by him voluntarily. I was sitting on one of the stools that we used for our Bertillion measurements, and he was sitting on the small one. He got down off the stool, on his knees, and volunteered, saying, ''I will tell you everything.'' His brother was arrested at the time, and he told us his brother was innocent; that there was no one on earth knew anything about it except himself. He said he had started to the mill that morning, and met the owner of the mill, and worked about fifteen minutes, when the mill broke down.

A written confession of the defendant to substantially the same effect was also introduced in evidence. The defendant for himself testified:

I was arrested Tuesday night, on the 3d of December, about 7:30. They carried me down to the courthouse, but did not ask me any questions that night. Wednesday morning they took me over to the courthouse and questioned me until about noon about the killing of

Mrs. Turner. I did not know anything about it, more than I heard from the folks that come to the inquest. I come to town the night I was arrested to see Scipio Jones, to have him find out about a warrant that I understood they had for me for carrying a pistol. I was in town on the day of the killing from about 10 or 11 o'clock until 2 o'clock that evening. On Friday morning I started to Mr. Shooks' mill, where I had been working. I met him on the road, and asked him if the mill was running today. He told me that the mill was going to run, but that he had no place for me; I turned around and come back home, and brought my bucket back in which I had my dinner; I had a shotgun besides; I stayed around home until 10 o'clock, then came on down and caught the train at Sweet Home at 10:05. After I got to Little Rock I went down to the labor office, at Markham and Main, and inquired what kind of work the labor agent had. I went on down to Cumberland street, between Second and Markham, and stayed around town a considerable while; then I went out to Eleventh and Broadway, where my sister used to live, but she had moved; I came on down to Sixth and Center, where I bought a rabbit out of a wagon for a dime; I walked in the saloon, and was getting a drink, when Pearson walked in; he claimed that he had no money; that he had been paying off some debts. He had a breech-loader gun in his hand, and wanted to sell it to me for $2. I offered him a dollar for it, and he said that he would not take it; I told him that he ought to be able to get a dollar for it, and he told me that if I would get a dollar for it he would give me a quarter, and all I wanted to drink. He showed me his name engraved on the barrel. He went in with me in the pawnbroker's office, and I told the boy we wanted $1.50 for it. He asked whose gun it was, and I told him W. A. Pearson's gun. He said that he would give $1 for it, and that when we came back next Saturday we could get it back again by giving $1.50 for it. Pearson bought me some beer, and give me a quarter, and I left and crossed over to Mr. Dan Lazarus', where

I sold the rabbit for 15 cents. I went down to the different places, trying to buy some meat, and finally bought some stockings down at Mr. Baum's. I saw some women that I come up on the train with, and told them that I was going back on the wagon, if I could find Luther. I come on down home in Luther's wagon. I did not buy any groceries that day. I got $3.70 on Saturday from Mr. Shooks for working down at the mill, and bought seventy-five cents' worth of meat from Smith & Estes, a twenty-four-pound sack of meal, fifteen cents worth of sugar, a dime can of coffee, a ten-pound bucket of lard, a dime box of snuff and forty cents worth of feed. I had three brown shells and one blue shell down at the house. The coat and pencil you have there belongs to me. Those are my overalls. The blood on my overalls was caused by a chicken I killed Saturday morning for breakfast. I do not know where W. A. Pearson or Jim Turner lives.

In rebuttal, the State introduced testimony as follows:

Frank Cloar testified: I run a store at Sweet Home. On the day of the killing I was in Little Rock, and about 1 o'clock P. M. on that day on my way home I met the defendant walking towards Little Rock. He had a gun in one hand and a rabbit in the other.

Mrs. Anna Willis testified: On the day Alice Turner was killed I came up to Little Rock from Sweet Home on the 10 o'clock train. We went to the station a good while before the train came. I saw all the people that got on the train, and defendant was not there.

L. Faust testified: There is a spring near where Alice Turner was killed called Martley Spring. About 11:30 o'clock A. M. on the morning of the killing, while unloading logs from a wagon, I saw a man come from that direction. He had a pair of overalls on and was running with a bucket and a gun in his hand. About 12:30 o'clock P. M. I heard a commotion of hunters and learned that Alice Turner had been killed. The man I saw running was running directly away from where the

body was found and going in the direction of Sweet Home pike. He limped a little.

Emma Hampton testified: On the morning that Alice Turner was killed I saw her pass my house between 11 and 12 o'clock going over towards Pearson's house. I was helping my father, L. Faust, unload a wagon. He called my attention to a colored man who seemed to be running. The man was coming from the direction from where the body was found. I did not pay any attention to him and do not know whether he had a gun and a bucket in his hand or not.

C. N. McCracken testified: On the day Alice Turner was killed I met the defendant about 1 o'clock P. M. between Sweet Home and Little Rock. He was about a mile and a half from Martley Cut and I judge about two and one-half miles from Main street. He had a gun and rabbit in his hand and was going towards Little Rock.

Two loaded gun shells were found in the defendant's house and they were of the same size and brand as the empty shell that was found near the body of the deceased and contain the same size shot as were taken from the head of the deceased. A pair of overalls was, also, found there which were sprinkled with blood. Other facts will be stated in the opinion.

The jury returned a verdict of guilty of murder in the first degree, and from the judgment rendered the defendant has duly prosecuted an appeal to this court.

*L. J. Brown* and *M. B. Rose,* for appellant.

The confession was not voluntary. Extrajudicial confessions are at best weak testimony. 4 Blackstone's Com. 357; Best's Principles of Evidence, American Ed., 555, § 573. And when the confession is obtained under such circumstances of inhuman cruelty and malice as are shown in this case, such a confession is utterly inadmissible. The participants in such inquisition could not be expected to confess their guilt, but there is much in the evidence and in the attending circumstances tending to establish that the confession was forced.

Moreover, the court erred in hearing the testimony

relative to the manner of obtaining the confession in the presence of the jury, since under the circumstances it tended to mislead and confuse them as to the real issue in the case.

The court's instruction as to confession was misleading. The "other proof" referred to in the statute, means other conclusive proof by positive and direct evidence and not mere disconnected circumstances. 77 Ark. 128; 74 Ark. 398; 50 Ark. 305; 72 Ark. 585; 70 Ark. 24; 69 Ark. 599; 66 Ark. 53; 1 Bishop, Crim. Proc., § 1227; 42 Law Ed. (U. S.), 549.

*Wm. L. Moose,* Attorney General, and *John P. Streepey,* Assistant, for appellee.

That the confession was freely and voluntarily made is clearly established by the evidence. The trial court heard the testimony of all the parties who were present when it was made and was in a position to observe them when they testified and to judge of the truthfulness of their statements. His discretion in admitting it in evidence will not be interfered with unless it is shown to have been abused. 93 Ark. 159; 94 Ark. 344; 99 Ark. 453.

HART, J. The principal ground relied upon for a reversal by the defendant is that the confession of the defendant was not voluntarily made, and this is the most serious question in the case. The defendant himself testified that the officers who had him in custody stripped him naked and commenced questioning him. That they threw him across the box that he was sitting on and then whipped him. That they cursed him, blindfolded him, put a wire on his thumb and then shocked him with an electric battery for twenty minutes. That one of the officers then took a rubber hose about the size of a gun barrel and struck him across the head and knocked him over in the corner. That they then kicked him around, knocked him down and beat him severely and that it was under these circumstances he made the confession. His brother to some extent corroborated his testimony in this respect. It was shown on the part of the State that

several officers had access to him and were investigating the crime with which he was charged. These officers were put under the rule and each one positively and explicitly denied that they cursed him, abused him, beat him or in any wise mistreated or threatened him. They say that they used no profane or abusive language in his presence and that they did not threaten or mistreat him in any way. That they held out no inducement whatever either of hope or fear to make him confess the crime with which he was charged. This proof was made by the State before the confession was introduced in evidence and also after the defendant had testified to the abuse and mistreatment of himself. The officers specifically denied the statements made by him and reiterated that they had neither by threats nor by promise of reward or benefit induced the defendant to make the confession.

The trial judge found that the testimony of the defendant was not true and admitted his confession in evidence, and his finding is conclusive on appeal unless we should find that the trial court abused its discretion and that the confession is fairly traceable to prohibited influences. *Smith* v. *State,* 74 Ark. 397. In regard to the admissibility of confessions by the defendant in the case of *Young* v. *State,* 50 Ark. 501, the court said:

"The well established rule is, 'that confessions of guilt, to be admissible, must be free from the taint of official inducement proceeding either from the flattery of hope or the torture of fear.' The object of this rule is not to conceal crime, but to protect the accused from the effects of a false confession induced by the hope of gaining, thereby, relief or some temporal advantage. A confession made in the absence of any threat of temporal injury or promise of a temporal reward or advantage, in respect to the charge against him in the absence of such influence as might swerve him from the truth—would be voluntary and admissible as evidence against the accused. Under such circumstances it would be unreasonable for him to make admissions calculated to bring upon himself the consequences of crime, unless they were true."

The evidence shows that the defendant was arrested on Tuesday night following the day that Alice Turner was killed. His brother was also arrested charged with complicity in the crime. The defendant was placed in jail and was not questioned by the officers the night he was arrested. The next morning they took him out of jail and carried him to the city hall, where they informed him of the evidence they had against him. They questioned him as to his whereabouts on the day of the killing and finally he made the confession testified to by Hobbs, one of the officers. He was not cautioned or warned by the officers that any statements he might make would be used in evidence against him. It would extend the opinion to an unreasonable length to set out in detail all the evidence in regard to the confession. It is sufficient to say that according to the testimony of the officers they held out no inducement to him. They did not threaten him in any way and did not hold out any hope of reward or benefit to him that might accrue if he should make a confession. But it is fairly inferrable from all the evidence which we have carefully read and considered that the confession was obtained by persistent questioning on the part of the officers. As we have already seen, the defendant was entitled to stand mute if he so chose and to have no confessions used against him save a voluntary statement and not one extorted by fear or induced by promises. Was he deprived of this right? A careful consideration of the evidence leads us to the conclusion that the trial court was warranted in finding that the officers held out no inducement to him. No deception was used to influence the defendant to make his statement. No hope of reward or benefit was held out to him. No threat of any kind was made against him. No inducement was held out to the defendant that would naturally convey to his mind that he would gain some advantage if he confessed. They did urge him to tell the truth, but in the same connection said, "It will be better for your conscience if you just come up and tell everything that happened, you will feel better." This

negatives the idea that they intended to convey to his mind that he would receive any temporal benefit by making a confession. Such a statement would not naturally convey to his mind that he would gain some advantage if he confessed. In the case of *Austin* v. *State,* 14 Ark. 555, the court quoted with approval the statement of Mr. Greenleaf to the effect that a confession is admissible, though it is elicited by questions whether put to a prisoner by an officer or by private persons and .that the form of the question is immaterial to the admissibility even though it assumes the prisoner's guilt. In 12 Cyc., page 463, it is said that the fact that a voluntary confession is made without the accused having been cautioned or warned that it might be used against him does not render it incompetent unless a statute invalidates a confession made where the accused is not first cautioned. To the same effect is Underhill on Criminal Evidence, (2 ed.), section 130; Wharton's Criminal Evidence (10 ed.), vol. 2, par. 676-c. In the application of these principles of law to the facts under which the confession in the instant case was made, we do not think the trial court erred in holding that the confession was voluntary. In so holding we do not wish to be understood as approving of all that was said and done by the officers with relation to the defendant. While the law does not require that the defendant should be cautioned as to his right to remain silent and of the fact that statements made by him will be used against him, it is always better that the officers give such warning in order to avoid suspicion of improper inducement.

Counsel for the defendant also urge that the judgment should be reversed because the jury was not withdrawn when the court heard the evidence that led to the confession to determine whether it was admissible in evidence. The approved practice is to withdraw the jury while such evidence is being heard before the court. The reason is this: that in the event the court does not admit the confession in evidence, the defendant may not be prejudiced by the hearing of the proceeding before the

court. In the instant case the confession was admitted in evidence and no prejudice could result to the defendant.

In respect to the confessions made by the defendant the court instructed the jury as follows:

"A confession of a defendant, unless made in open court, will not warrant a conviction unless accompanied with other proof that such offense was committed by some one. The confession of a defendant, if accompanied with proof that the crime was committed by some one, will warrant a conviction, if you believe it.

"A confession, in order to be admissible or to be considered, must be made voluntarily; that is, without anybody holding out any hope of reward or leniency, or fear of punishment for not doing it. If that is done, it is competent for the jury to consider it and give it such weight as they see fit. You have a right to consider all the circumstances surrounding the party at the time the confession is made, and give to it such weight as you think proper under all the circumstances."

"If you are satisfied of this man's guilt beyond a reasonable doubt, it is your duty to convict him. If you have a reasonable doubt of his guilt, it is your duty to acquit him. This you alone can determine."

Counsel for the defendant contend that the court erred in giving this instruction in regard to the confession and cite as authority for their position the case of *Hubbard* v. *State*, 77 Ark. 126, but we can not agree with their contention in this respect. There the jury were told that they could convict the defendant if they were satisfied beyond a reasonable doubt by the confession alone, or in connection with the other testimony in the case that the defendant was guilty of the crime charged. The court said that the confession alone is insufficient to sustain a conviction and that there must be other proof of the commission of the offense. Kirby's Digest, § 2385, is as follows:

"A confession of a defendant unless made in open

court will not warrant a conviction unless accompanied with other proof that such offense was committed."

In the case of *Melton* v. *State*, 43 Ark. 367, the court held that the confession of a prisoner accompanied with proof that the offense was actually committed by some one will warrant his conviction. That is to say, under our statute to warrant a conviction upon an extrajudicial confession of the accused, there must be independent evidence to establish that the crime has been actually perpetrated by some one. In the instant case there was independent testimony which showed that the deceased had been killed by some one and the circumstances independent of the confession strongly pointed to the defendant as the person guilty of the crime. This phase of the case was embodied in the instruction complained of, and the court did not err in giving it to the jury.

We have carefully examined the instructions given by the court. They were full and explicit, covering every phase of the case, and were fair to the defendant. The evidence was amply sufficient to sustain the verdict, and the judgment must be affirmed.