WEST *v.* STATE.

Criminal 4091                                   120 S. W. 2d 26.

Opinion delivered September 26, 1938.

*Mills & Mills* and *Ben B. Williamson,* for appellant.

*Jack Holt,* Attorney General, and *John P. Streepey,* Assistant, for appellee.

MEHAFFY, J. The appellant was convicted in the Searcy circuit court of manslaughter and his punishment fixed at five years in the penitentiary. Motion for new trial was filed and overruled, and the case is here on appeal.

The information filed by the prosecuting attorney charged the appellant with murder in the first degree by shooting and murdering Jim Gilliam. The evidence shows that there were services at a church; that Jim Gilliam was the pastor of the church and was also deputy sheriff; Gilliam asked Dinsmore Wasson to serve as deputy sheriff at the church that night for the protection of the church; Wasson and Gilliam took a gun from Tim Reed and turned Reed loose; after this was done the Reed boys left in a few minutes and stayed away about thirty minutes and came back; Gus Phillips had a new car, and he and the Reed boys drove up so that the lights would shine on Wasson and Gilliam. Wasson testified that he and Gilliam would step back in the dark; that they did

this three or four times. Wasson also testified that when he got to the church he saw Gilliam coming through an old field by the church from the east with a fruit jar, and that Gilliam took the fruit jar in the house and said he got it off of Tim and Shim Reed.

A great number of witnesses testified, but it will not be necessary to set out the testimony of each witness. The chief contention made by appellant for reversal is that the evidence is insufficient to sustain a conviction for manslaughter.

There was, as shown by the evidence, a good deal of shooting done. The appellant himself was shot, and his eighteen-year-old brother was killed. The appellant was convicted of killing Gilliam. Gilliam was deputy sheriff and had a gun himself. Young West, who was killed, according to the evidence, fired several shots. There is no direct evidence that the appellant shot Gilliam. It is contended that somebody behind appellant shot Gilliam. That he was shot and killed is undisputed, and it is also undisputed that appellant fired several shots. After the appellant had gone away, he returned about the time that witnesses saw Phillips and the Reed boys return.

Wasson testified that he was told that Gilliam needed him and he looked around and saw the scuffle. He could see the scuffle over the gun, but before he could get to them appellant's brother told everybody to stand back and told Wasson to stand back, and threw his gun on Wasson, and Wasson then shot young West. Gilliam and appellant were scuffling over the gun. Witness did not see Gilliam when he was shot. Gilliam's gun was an automatic German Lueger, size 30. Witness saw appellant shooting and did not know whether he was shooting at Gilliam, but thought he was shooting at witness. Appellant was trying to take the gun away from Gilliam, and witness thinks he did do this.

William Treadwell testified in substance that he was at the church the night of the killing and saw the altercation between appellant and Jim Gilliam; appellant and Elton West were standing at the edge of the porch; Gilliam was south of them and the car was ten or twelve feet away; Gilliam asked the boys to be quiet; appellant

turned around and asked him to repeat what he said, and Gilliam repeated it; appellant then asked Gilliam to let him have the gun and the scuffling began; Gilliam had the gun in his shirt; the distance between Gilliam and appellant was five or six feet; something was said then that the witness did not understand and he then saw their hands locked holding the gun; when they got into a scuffle they ganged around them and appellant's brother ran up and said "stand back"; Wasson then shot appellant's brother and fired at appellant; appellant fired three shots in the range of Wasson and Gilliam; thinks appellant fired with the gun he had taken away from Gilliam; did not see Gilliam shoot anybody; saw Tim Reed that night in the car with Gus Phillips; Tim Reed is a brother-in-law of witness; appellant and Gilliam clinched in scuffling over the gun; both of them had hold of it; after appellant was shot he got up and shot in the range of Wasson and Gilliam; thinks the shots were fired from the preacher's gun.

Frankie Lathan testified that he was at the church that night and saw appellant standing by the edge of the porch talking and preacher Gilliam walked up and asked him to get back if he was going to talk, and appellant said, "Come here a minute, preacher, I want to see you." Gilliam said, "Go ahead, Jewell, I don't want to have any trouble with you." The preacher turned back to witness and appellant grabbed at him and the scuffling began.

Al Suggs testified that he was at the church the night of the shooting and was with Gilliam and appellant approached from behind the car and said, "Jim, I want to speak to you," and Jim said, "I will talk to you right here, Jewell." Appellant backed up a few steps, sprang at Gilliam and got him at the belt line and about that time said: "I want that gun." Gilliam said, "Come on boys," and appellant went to shooting. Witness said he did not know of his own personal knowledge who shot Gilliam; the first time he saw Tim Reed he was going toward the front of the school ground; saw him two or three times after that and remembers one time when Gilliam and Wasson were taking a gun off of him. Appellant came up from the rear of the car and said, "I want

to speak to you, Jim''; does not think that Gilliam had his hand on the gun at the time; Gilliam was standing with his side to witness and when appellant spoke he turned and faced witness; appellant said, "I want that gun," and witness heard Gilliam say, "Don't do that, Jewell." Appellant was trying to get his hand on the preacher's gun; witness saw appellant shoot three times; does not know who picked up the gun and the next day witness found a .38 bullet which he gave to the sheriff.

Dewey Gilliam testified that he was at church and saw appellant drive up. Gus Phillips' car drove up about the same time. Appellant took hold of Gilliam and said, "Where is the gun?" The preacher pushed him back and Jewell slapped at him and grabbed at him and they started wrestling; did not see appellant shoot; saw appellant get out of his car, but does not know who else got out; Reed and Phillips were about as close to witness as the car; witness does not know whether he is related to Jim Gilliam or not.

John Harness testified that he heard and saw the shooting and saw appellant when he came, and he saw Elton shoot Dinsmore and saw Dinsmore shoot Elton.

Claude Ward testified that he was constable; was at the church the night of the shooting; knew the appellant and Gilliam in his lifetime; saw the killing and helped to make the investigation; that the preacher died early next morning; saw Gus Phillips get out of the car, but did not know whether Tim Reed was in it; when the scuffling started, he heard appellant say, "Give her up, Jim," and the preacher said, "Don't do that, Jewell." They were scuffling over a gun; Wasson and Elton West were shooting; never saw appellant or Gilliam shoot.

Bud Treadwell was present at the school house the night of the difficulty; heard Gilliam tell some parties to be quiet and not disturb those in the house; he patted appellant on the shoulder and said, "Be quiet, boys, please," and the preacher said, "Go ahead, Jewell, I don't want to have no trouble." The preacher was standing still when appellant walked up to him; appellant reached out and got hold of him either on the belt or the arm and the preacher said, "Don't do that, Jewell," and

called for help. His testimony as to the shooting of Elton West and Wasson was substantially the same as the others. Went with appellant to the Searcy hospital.

Oscar Barnett, the sheriff, testified that he was a brother-in-law to Tim Reed; he made an investigation in regard to the killing of Jim Gilliam; he was shot through the left side; Dr. Bing took the bullet out and the bullet shown witness was the one taken out. The gun exhibited to witness was given to witness by Claude Ward and was Gilliam's gun; it shoots a bullet .30; a .38 is a larger bullet. This witness also testified about sending the gun and bullet to the Federal Bureau of Investigation and the letter with the return of the bullet and gun; they show that Gilliam was shot with a .38.

Appellant testified that he did not shoot Gilliam and there were other witnesses whose testimony tended to contradict some of the testimony of the state's witnesses.

The appellant earnestly contends that under the instructions of the court the jury could not have found him guilty. He says it is true that this court has repeatedly held that there is no cause to complain of the instructions given by the court on a higher degree than that of which he was convicted; yet in this cause, it is argued, that the verdict of the jury amounted to an acquittal of the appellant of being present, aiding, abetting, assisting and encouraging, and that he was also acquitted of being a party to any conspiracy, and appellant says: "So in order to maintain the conviction this court must say that there was some substantial testimony to the effect that the appellant himself fired the fatal shot." It is earnestly contended that there is no such evidence.

The evidence shows that there were some 15 or 20 shots fired, and there is ample testimony to show that appellant did some of the shooting. But appellant says that the only gun he ever had in his possession was the gun belonging to Gilliam, and that while appellant got possession of the gun, appellant was fired on from behind by Wasson. He argues that it is known positively that Gilliam was killed with Phillips' .38 revolver. It is true that there was evidence tending to show that Gilliam was shot by a .38 revolver. The jury, however, may not have

believed this. Some of the evidence shows that the doctor took the bullet from the body and that it was a .38 bullet, and the evidence shows that the bullet and Phillips' .38 revolver were sent to the Federal Bureau of Investigation, but whether the bullet taken from Gilliams' body was the same bullet that was sent, and whether the gun was the same, depended on the testimony of witnesses, which the jury might or might not believe.

The appellant swears that he did not shoot Gilliam with any sort of gun, but that he had a .22 caliber gun in his car, but no gun about his person. Other witnesses testify in substance that Gilliam was shot with his own gun after the appellant got possession of it, and it was found on the ground where the scuffle had taken place. These were facts to be determined by the jury. The sheriff found the Phillips gun in Phillips' car the next morning. It may have been there all the time or it may have been used by appellant and then put in the car.

There is ample evidence to support the finding of the jury. Under the settled rules of practice the jury is the judge of the credibility of the witnesses and the weight to be given to their testimony, and it is also a well-settled rule that the evidence admitted at the trial will, on appeal, be viewed in the light most favorable to the appellee, and if there is any substantial evidence to support the verdict of the jury, it will be sustained. *Daniels* v. *State,* 182 Ark. 564, 32 S. W. 2d 169; *Walls & Mitchell* v. *State,* 194 Ark. 578, 109 S. W. 2d 143; *Humphries* v. *Kendall,* 195 Ark. 45, 111 S. W. 2d 492.

There were some objections to certain instructions, but appellant, in his argument concedes that it is not error for the court to give an instruction on one degree of homicide when the jury finds the defendant guilty of a lower degree. The appellant correctly states that the testimony is very conflicting due to the fact that at least three guns were in play about the same time. The witnesses were more or less excited, and for that reason it was hard to arrive at just what did occur. But the only persons who could rightfully determine that matter under our system was the jury. They were the judges of the credibility of the witnesses and the weight to be given

to their evidence. The jury heard the witnesses testify, and doubtless considered all the circumstances, and reached the conclusion that the evidence was sufficient to justify their verdict. We have reached the conclusion that there is substantial evidence to sustain the verdict, and the judgment is affirmed.