BROWN *v.* STATE.

4235                                            155 S. W. 2d 722

Opinion delivered November 17, 1941.

*Luther H. Cavaness* and *W. F. Reeves,* for appellant.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

GREENHAW, J. The appellant was charged by information in the Marion circuit court with the crime of murder in the first degree, alleged to have been committed by

killing John R. Stovall, on March 16, 1939, by striking him upon the head with a skein from a wagon axle.

This is the second appeal in this case. The appellant was convicted of murder in the second degree in the first trial and sentenced to twenty-one years in the penitentiary. Upon appeal to this court the case was reversed and remanded for a new trial on account of error committed in the admission of an alleged confession by the appellant, obtained from him under such circumstances as to show it was not freely and voluntarily made. *Brown v. State,* 198 Ark. 920, 132 S. W. 2d 15. After this case had been remanded to the lower court for a new trial, another trial was had therein on October 22, 1940, which resulted in a mistrial. The third trial of this case took place on August 13 and 14, 1941, resulting in the conviction of the appellant for the crime of involuntary manslaughter, and his punishment was fixed at confinement in the Arkansas penitentiary for a term of one year. A motion for new trial was filed and overruled, and the case is here on appeal.

The evidence in this case showed that the appellant was the son-in-law of the deceased, John R. Stovall, and that appellant and his wife had been living at the home of his father-in-law for over nine months before the alleged crime occurred. The deceased was a farmer, living upon the road between Eros and Bruno. The residence of the deceased was on one side of the road, about thirty feet back from the road, and his barn and shop were across the road from the residence. The barn and shop were only a short distance from the road, the barn apparently being some farther from the residence.

On the morning of March 16, 1939, the deceased arose around 4:30 o'clock, and his wife arose around 5:00 o'clock. The deceased went to the barn to feed his stock, preparatory to farm work, and after he had gone the appellant, who apparently arose shortly after the deceased, came into the living room and sat by the fire a few minutes while his mother-in-law was arranging to prepare breakfast. The deceased returned from feeding his stock, and as he came into the house the appellant left, supposedly for the purpose of milking. The appellant's

wife was arranging to help her husband milk. The deceased left the house again a very few minutes after the appellant had left,'and went in the direction of the shop. Stovall's dog barked very soon after he had left the house, and about the time the wife of the appellant was preparing to go and assist him in milking. She found the body of her father lying at the edge of the road near the shop, and called her husband, the appellant herein, who was apparently somewhere around the barn.

The appellant then went into the house, and addressing the wife of the deceased, who was at that time in the act of making biscuits, said: "Where's Pop?" and she stated: "He just a few minutes ago went down to the shop." Appellant then said: "Pop is gone." She then inquired of him what he meant by saying "Pop is gone," and appellant then said: "Pop is lying out in the road dead." She then said, "Run call your Uncle Joe." She further testified that appellant made no motion to go, and as she started and made the second step the appellant seized her with his arms around her back, and as she opened the door he jerked her back and refused to let her go to the body, whereupon she fainted.

The body of the deceased was found lying face downward at the edge of the road, near the shop, which was just across the road from the house. The deceased, according to the undisputed evidence, had been gone probably five or six minutes, and not over ten minutes, when the wife of the appellant discovered the body and called her husband.

Notice of the death was given by telephone, and soon neighbors and relatives began to arrive. Walden Heath and Joe Stovall appeared on the scene as it was beginning to get daylight. Heath testified that the deceased was lying on his face, and that blood had run down the road from six to ten feet; that the skein was placed at the injured part of the head of deceased and it looked as if the skull had been caved in by the blunt part of the skein. He further testified that Joe Stovall remarked in the presence of the appellant that they would need to have a coroner's jury or get the officers there before the body was moved, and at that time the appellant said that if

they got the officers or the law there, they would be suspicious and he was afraid they would suspect him.

A wagon skein was found near the body of the deceased, and the doctor, after he arrived, placed this skein at the point of injury on the head and it appeared that the injury was made with this instrument. The skull was crushed on the left side of the head, and there was a skinned place along the back of the head.

Dr. Moore testified that he arrived around 8:00 or 9:00 o'clock in the morning and examined the deceased. The deceased, as he recalled, was struck on the left side of the head. A deep gash was made down to the skull, and that was the blow he thought killed him. It was a broad injury and made by some heavy instrument, similar to the skein if it was not actually made by it. The injury on the head was sufficient to kill the deceased.

The undertaker testified that he prepared the body for burial and the head of the deceased was crushed on the left side; that there were two wounds on the head, one farther back than the other.

Joe Stovall testified that when he and Walden Heath arrived, the appellant was standing by the body and seemed very unconcerned about it, and never made any announcement about what he thought had occurred. Witness had heard the appellant, before the death of witness' brother, say that he was expecting that something was "apt" to happen to him. He remarked in the presence of the appellant that his brother had been murdered and suggested that they call Dr. Moore and all the necessary officers to come for an investigation, and when he made this suggestion the appellant said: "That will make it look kindly suspicious on me." Previous to the death of his brother, John R. Stovall, he heard the appellant say that "John R.'s way of advising him made him very nervous; he couldn't hardly stand it." At the school house, when they were discussing telephone connections, appellant stated: "We must do something about that 'phone line. We must get connection," and he asked appellant what was the hurry, the appellant said: "John R., I am expecting him to fall over any time." There was

no evidence showing that the deceased was afflicted with heart trouble or other disease which might cause him to drop dead at any time.

Stovall further testified that at the scene of the killing, in discussing the skein as the instrument which was probably used in killing the deceased, appellant said: "I think it would take a stout young man to kill a fellow with a thing like that."

While the evidence showed that the appellant had gone, supposedly to milk the cows, no milk was in fact found or brought into the house, although Walden Heath testified that the appellant said he had milked three of the cows. Heath found two buckets setting by the lot gate, and there was no milk in the buckets, but only a little ice in the bottom of one. As the family had been milking five cows, Heath and appellant milked two cows. He did not observe the other three at that time, but around 9:00 o'clock that morning did see them, and they did not look like they had been milked. There was evidence of other witnesses that three of the cows looked like they had not been milked that morning.

The evidence showed that the wagon skein had been lying for several months on the outside of the shop against a tree only a few feet from where the body was found, and that this tree was large enough for a person to hide behind. It was still dark at the time the deceased was killed.

Gus McCracken, the sheriff of Marion county, testified that he went to the scene of the killing to make an investigation the morning it occurred. He talked to the appellant, and in the discussion appellant stated: "When the girls come they are going to accuse me of killing the old man." The sheriff then stated that he examined the wagon skein and was discussing the wound on the deceased's head when the skein was placed in the place of injury, and that it fitted the wound.

Owen Fudge, a member of the State Police, assisted in the investigation, and testified that the suspicious actions of the appellant warranted his arrest, in his opinion, and that he arrested him. The appellant acted nerv-

ous. He further testified that there was nothing between the barn, where the appellant was supposed to milk, and the place where the deceased met his death to obstruct vision, except a fence and gate, and that it was only about 80 or 90 feet from the barn to the place where the body was found.

Although appellant had suggested to Heath that deceased could have been hit by a car, he admitted to Fudge that he saw no one, nor a car, horses, or stock of any kind pass that morning prior to the death of the deceased. There was other evidence that no car passed the deceased's home that morning prior to his death.

Evidence showed that there had been some quarrels, but no serious trouble, between the appellant and the deceased and his family. There was evidence that the deceased had no enemies, and had had no serious trouble with anyone.

It would serve no useful purpose to extend this opinion by attempting to set out all of the facts and circumstances in evidence. After a careful consideration of all of the evidence in this case we are unable to say that there was not sufficient evidence to sustain the verdict of the jury.

The appellant did not testify, but the court, at the request of his attorneys, gave the following instruction: ''You are instructed that it is the privilege of the defendant either to testify in his own behalf or decline so to testify. The failure to testify is neither any evidence of his guilt nor a presumption of law or fact of his guilt. Such fact is not to be considered by you in determining his guilt or innocence in this case.'' This was a correct declaration of the law. There is nothing in the record to show that the fact that appellant failed to testify was ever thereafter commented upon or referred to.

The appellant assigns as errors the giving of instructions by the court relating to all the lower degrees of homicide, including involuntary manslaughter, for which the appellant was convicted. We do not think the court erred in so instructing the jury. In the case of *Trammell* v. *State,* 193 Ark. 21, 97 S. W. 2d 902, this court disposed

of a similar argument in the following words: "It is argued, in this connection, that the giving of this and other instructions on the lesser degrees of homicide resulted in the jury finding appellant guilty of voluntary manslaughter, whereas he was either guilty of murder in the first degree or of no crime at all. It has been frequently held, however, that this is an error of which the accused may not complain where the testimony supports the finding that he was guilty of a higher degree of homicide than that for which he was convicted, as is the case here. *Roberts* v. *State,* 96 Ark. 58, 131 S. W. 60; *McGough* v. *State,* 113 Ark. 301, 167 S. W. 857; *Arnold* v. *State,* 179 Ark. 1066, 20 S. W. 2d 189; *Spear* v. *State,* 184 Ark. 1047, 44 S. W. 2d 663."

Appellant contends that reversible error was committed by the court in the giving of instruction No. 27, pertaining to circumstantial evidence, for the reason that no circumstances were proved that were consistent with the guilt of the defendant and wholly inconsistent with his innocence, or that would warrant the court in submitting the case to the jury on the facts and circumstances proved. With this contention we cannot agree. We have examined instruction No. 27 and find that it is a correct declaration of law, and that it was not error to give this instruction, under the facts and circumstances in evidence in this case.

The appellant finally contends that there is no substantial testimony in the record to support the verdict. We have already stated that in our opinion there was substantial testimony to support this verdict. The rule of law by which this question is determined in this state was most recently restated in *Herron* v. *State,* 154 S. W. 2d 351, in which this court said: "Under the settled rule of practice the jury is the judge of the credibility of the witnesses and the weight to be given to their testimony, and it is also a well settled rule that the evidence admitted at the trial will, on appeal, be viewed in the light most favorable to the appellee, and if there is any substantial evidence to support the verdict of the jury it will be sustained." *West* v. *State,* 196 Ark. 763, 120 S. W. 2d

26; *Daniels* v. *State*, 182 Ark. 564, 32 S. W. 2d 169; *Walls & Mitchell* v. *State*, 194 Ark. 578, 109 S. W. 2d 143.

Finding no reversible error, the judgment is affirmed.