WILSON *v.* STATE.

4238 159 S. W. 2d 726

Opinion delivered February 23, 1942.

*Abe Collins* and *Gordon B. Carlton,* for appellant.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

HOLT, J. Jim Wilson, appellant, was charged in an information with the crime of murder in the first degree. A jury convicted him of this offense and recommended life imprisonment. From the judgment of the court sentencing appellant to a life term in the state penitentiary, this appeal is prosecuted. Several grounds for reversal are presented.

It has long been the settled rule in this state that the evidence at the trial will, on appeal, be viewed in the light most favorable to the state, and if there is any substantial evidence to support the verdict of the jury, it will be sustained. *West* v. *State,* 196 Ark. 763, 120 S. W. 2d 26; *Daniels* v. *State,* 182 Ark. 564, 32 S. W. 2d 169; *Walls & Mitchell* v. *State,* 194 Ark. 578, 109 S. W. 2d 143; and *Clements* v. *State,* 199 Ark. 69, 133 S. W. 2d 844.

The record reflects that appellant on May 1, 1941, after arming himself with a shotgun, a pistol, and a supply of ammunition, got into his automobile and started out to find Homer Bonds, the man whom he killed approximately one hour later. Appellant drove his car, and the shotgun and pistol were on the front seat with him. His father accompanied him, riding on the back seat. Thus equipped, appellant drove first to the home of the deceased and upon inquiry was told by Bonds' housekeeper that he was some distance down the road

driving a tractor. After waiting a short time, appellant drove on down the road and located Homer Bonds coming toward him driving a tractor, which was pulling a trailer loaded with telephone poles. Appellant stopped his car some distance from Bonds and waited for him to come along side. Appellant, his father, and Burl Vancil are the only eyewitnesses as to the progress of events from this point.

Vancil, a witness for the state, testified that he was on the tractor with Homer Bonds at the time. Bonds was driving the tractor and that the seat on which he was sitting was close to the tractor, and no arm rests or parts came up around the seat. Vancil was riding on the trailer, loaded with telephone poles, which was hooked to the tractor. He was some four feet back of the driver's seat. He first noticed appellant and his father when they turned off the highway. When the tractor reached a point near appellant, witness heard appellant say, "Hello there." Witness then looked up and saw appellant "coming up with the gun." The door of his car was open and appellant shot Bonds three times. Bonds fell from the tractor, which continued in motion and ran over one of his arms. Witness caught the wheel of the tractor, turned it crossways of the road and stopped it. Bonds lived but a few minutes. Witness did not see any pistol upon the body of deceased. He had worked with him all day. He had never seen him carrying a pistol. After the killing, appellant did not seem to be excited and let witness know that he was not going to bother him. Witness saw the pistol which appellant used and the shotgun on the front seat of the car. A few minutes after the shooting, a truck containing strawberries came up and appellant ate some of the berries, and stated that he had not had any lunch.

Raymond Leard, the driver of the truck, testified that he arrived on the scene about two minutes after the shooting and appellant ate some of his strawberries and asked him if Bonds were dead. He told him he was not dead yet, and appellant asked him how long it would take him to die, and appellant remained at the scene until the undertaker took the deceased away.

Jim Manning, deputy sheriff, testified he received information that appellant was looking for Bonds and he went in search of appellant and followed him to the scene of the killing. He took appellant in charge. He saw no pistol taken from the body of deceased.

Mrs. Beatrice Green testified for the state that the shooting occurred near her home. She saw appellant in his car and Bonds just before the shooting occurred and as she looked out she heard three shots. Later she heard appellant say, "I got the guy I was after," and saw him get up on the truck and get some strawberries and "he was laughing as he left the scene."

Mary Ellen Kitchens testified that she was working for the deceased at the time of the killing. Appellant and his father drove up to deceased's home and inquired where he was. She told them that he had gone off on the tractor down the road; that they sat there near the front gate and talked awhile then drove off down by another gate and again stopped and talked awhile. Appellant was driving the car and his father was on the back seat, and appellant was not excited, but was "pleasant and smiling." After a short time they drove on down the road.

Custer Hughes, a merchant at Gilham, testified that he got to the scene of the killing about ten minutes after it occurred. Bonds was dead when he arrived. He found no gun about his clothes or under the tractor.

There was evidence on the part of appellant that he had no intention of killing Homer Bonds, but that when he went in search of him he went armed because he believed Bonds to be a dangerous man; that he had been informed by his wife, his father and mother that the deceased had made improper advances toward his wife, and that he desired to talk to the deceased to obtain an explanation of his actions in this regard; that when the deceased drove up on the highway to the point where he (appellant) had stopped his car, the deceased dropped one hand from the steering wheel as if to draw a gun and he then shot deceased three times in defense of his life. There was evidence, which appellant contends, showed

that he, appellant, was laboring under an irresistible impulse to kill at the time.

We think the evidence was ample to support the jury's verdict. It was within the province of the jury to consider and weigh any and all conflicting testimony, and it has taken the state's view. Unless, therefore, there was error committed in the trial of appellant, the jury's verdict must stand.

We proceed now to consider the alleged errors.

Appellant contends that the court erred in refusing to allow witness, Luttrell, a justice of the peace, to testify that appellant's wife, in appellant's presence, recounted to him (Luttrell) that deceased had come to her home after dark and tried to force his attentions on her; that he came through the back door and tried to push her back into the house, it being appellant's contention that this testimony given to Luttrell, in appellant's presence about an hour before the killing, so affected appellant's state of mind as to arouse an irresistible impulse to kill. We cannot agree with appellant's contention.

The record reflects that this statement of appellant's wife to Luttrell had already been told to appellant by his mother and by his wife, and appellant and his mother were permitted to testify as to what appellant's wife told them occurred at appellant's home on Monday night before the killing.

The record reflects that the trial court permitted all testimony in the nature of threats that were communicated by the wife to appellant in the presence of the witness, Luttrell. It must be remembered that when appellant consulted Squire Luttrell he had already been told a short time before, not only by his mother but by his wife, all the details of the deceased's improper advances toward appellant's wife, and both appellant and his mother had detailed to the jury the wife's account of these improper advances, and we think the court did not err in refusing to permit the witness, Luttrell, to again repeat the wife's story to him. The trial court did permit Luttrell to testify that appellant was told,

after the wife had made her statement to Luttrell about what had occurred, that the only charge he could bring against Homer Bonds would be that of a misdemeanor.

This court in *Bolling* v. *State,* 54 Ark. 588, 16 S. W. 658, in commenting upon the refusal of the trial court to give certain instructions bearing upon the defense of an irresistible impulse, said: "Moreover, the instructions asked made no distinction between insanity and mere passion or revenge, but declared that an irresistible impulse, from whatever source arising, would absolve the defendant from responsibility for acts done under its sway. Such is not the law; but when an act is done under the influence of anger or resentment, it matters not how violent they may have become nor that they may have acquired absolute dominion over the actor, he is responsible to the law if his act be otherwise criminal."

And later in the case of *Hankins* v. *State,* 133 Ark. 38, 201 S. W. 832, L. R. A. 1918D, 784, this court said: "But be this as it may, the point we wish to stress here is that the comments of this court in passing upon the prayers for instructions in *Bolling* v. *State,* show that the court had in mind and did not intend to ignore the doctrine that irresistable impulse is a defense to a charge of murder when such impulse is the product of a diseased mind."

We think the jury in the instant case was clearly warranted in finding from all the evidence, as it must have, that the killing of the deceased by appellant here was not the result of an irresistible impulse from a diseased mind, but was the result of an impulse growing out of such violent anger and resentment as might control appellant's will. When appellant inquired of Mary Kitchens, the deceased's housekeeper, a short time before the killing, where he could find the deceased, he appeared to be in a good humor and was pleasant and smiling. After the killing he appeared to be calm and collected.

Appellant next contends that the court erred in refusing to permit appellant to testify that he heard his wife tell Squire Luttrell, about an hour before the shoot-

ing, about the deceased's advances toward her at appellant's home. The appellant, however, was permitted to testify as to what his wife told him (appellant) concerning the alleged attempt of deceased to break into his home and about threats deceased was alleged to have made at that time. It is conceded that the wife was not competent to testify for or against her husband in the case. We think no error was committed here.

As indicated, appellant had already detailed to the jury his wife's version of the deceased's advances toward her and to have permitted appellant to again detail the wife's story as he heard her relate it to Squire Luttrell, would in effect bring before the jury indirectly testimony of the wife which she was incompetent to give.

Appellant urges that the court erred in admitting the testimony of Hortense Hudson. There was testimony on the part of appellant that his wife told him that the deceased came to her house at night, made improper advances and attempted to force his way in. In rebuttal of this testimony, Hortense Hudson testified on behalf of the state that the deceased asked her if she thought appellant's wife would date him and that she replied that she did not think so, but that appellant's wife told her she wanted to see the deceased and stop some of the talk, and asked the witness to tell the deceased to come to see her after the show. We think under the circumstances that this was proper testimony in rebuttal, and that there was no error in admitting it. If true, this testimony tended to show that the deceased went to the home of appellant at the invitation of his wife.

Appellant next complains about the admission of certain testimony of witness, Leslie Dillahunty. The testimony complained of appears to have been offered by the state to impeach certain testimony of the witness, Hortense Hudson. After reviewing this testimony, and without attempting to abstract it here, we think that no prejudice to appellant's rights resulted in admitting this testimony, and that no error was committed.

Appellant argues that instruction No. 12, given by the court, was erroneous for the reason that it failed to

take into account the question of motive. We cannot agree with appellant's contention. The first part of the instruction is: ''You are instructed that the only purpose for which proof of threats is admissible is to throw light on the state of mind of the defendant at the time he fired the fatal shot, and to show who was the probable aggressor; . . .''

A similar instruction was approved by this court in *Long* v. *State*, 76 Ark. 495, 91 S. W. 26. We think it clear that what was meant by the court by the words ''state of mind of the defendant'' was the motive of the defendant at the time he fired the fatal shots, and that the jury must have so understood it.

Next complaint is made about the giving of instructions 11 and 13. Instruction 11 is as follows: ''The law of self-defense does not authorize the right of an unlawful assault. If you believe in this case beyond a reasonable doubt that the defendant, armed with a gun, sought the deceased with the felonious intent to kill him, or sought, or brought on, or voluntarily entered into the difficulty with the deceased, with the intent to take his life, then the defendant cannot invoke the law of self-defense, no matter how imminent the peril in which he found himself placed, unless the defendant withdrew or actually attempted to withdraw from the combat before the fatal shot was fired.''

In *Higgs* v. *State*, 165 Ark. 613, 264 S. W. 859, this court approved a similar instruction based on facts similar in effect to those presented here. The instruction there approved is in this language: ''If you find from the evidence in this case beyond a reasonable doubt that the defendant provoked, brought on, or voluntarily enterd into the difficulty or that he sought out the deceased for the purpose of bringing on the difficulty, and when he did so killed his assailant, he cannot shield himself on the plea of self-defense; he cannot take advantage of the necessity produced by his own unlawful or wrongful act.''

Instruction 13 appears to be in the language of the statute, § 3001 of Pope's Digest, and applicable to the

928

facts. In *Gentry* v. *State*, 201 Ark. 729, 147 S. W. 2d 1, this court said: "This court has repeatedly ruled that instructions which follow the wording of the statute, and are applicable to the facts in the particular case, are always proper. . . ."

We think, therefore, that these instructions were properly given.

Objection is next made to the giving of instruction 15. This instruction is: "You are told that the law has such regard for the sanctity of human life that one person shall not kill another person, even in his necessary self-defense, except as a last resort, and when he has done all in his power, consistent with his own safety to avoid the danger and avert the necessity of the killing. So in this case although you may believe that, the deceased was making a hostile demonstration against the defendant at the time of the killing, still if you further believe from the evidence that the defendant could have reasonably avoided any danger to himself and averted the necessity for killing the deceased, it was his duty to have done so."

Appellant's contention is that this instruction ignores the right of appellant to stand his ground and defend himself against murderous assault. An instruction in almost identical language with this instruction was approved in *Roberson* v. *State*, 165 Ark. 614, 264 S. W. 822. There the language used in the instruction is: "You are instructed that the law has such regard for the sanctity of human life that one person may not kill another, even in his necessary self-defense, except as a last resort, and when he has done all within his power consistent with his safety to avoid the danger and avert the necessity of the killing; so in this case, although you may believe that the deceased was making a hostile demonstration against the defendant at the time of the killing, still, if you further believe from the evidence that the defendant could have reasonably avoided any danger to himself and avert the necessity of killing deceased, it was his duty to do so, and unless he did do so, then he would not be justified in killing the deceased upon the plea of self-defense."

There this court in commenting on the instruction said: ''Appellant interprets this instruction as imposing the absolute duty upon him to retreat. We do not so construe it. It simply means that it was the duty of appellant to do everything in his power consistent with his safety to avoid killing deceased, and, if by retreating he could have done this without endangering himself or his life, he should have done so.''

We conclude, therefore, that appellant's objection is untenable.

Appellant finally argues that instructions 20 and 23, given on the part of the state, were erroneous. We think it could serve no useful purpose to set out these instructions. It suffices to say that we have carefully examined them and have reached the conclusion that they were a correct declaration of the law as applied to the facts presented, and that when read in connection with all of the other instructions were correct, the jury was not misled, and the rights of the appellant were in no way prejudiced.

On the whole case, finding no error, the judgment is affirmed.

SMITH, J. (dissenting). Appellant, who was employed in Ashdown, made week-end trips to his home at Gillham. He received in Ashdown the following letter from his wife:

''Wednesday, P. M. At Home

''Dear Jim:

''I have wondered and worried until I am almost crazy whether to write you or wait until you come in. Somehow I looked for you this a. m. but as you didn't come I have decided to write you.

''Monday night there was a certain man prowling around my house. Mr. and Mrs. Wilson saw him and ran him off. Mr. Wilson hunted all over town for him with his gun and you know if he could have found him what the consequences would have been. They didn't want me to tell you about it, but I decided I wanted you to know. I may go ahead and have him arrested this afternoon and have him in jail before you come home. I

just don't know what to do. I wish you would come in as soon as you get this. and we will tell you all about it. But, Jim, you just have to use your head and think it over before you do anything, cause he may be expecting you or your dad to jump him and he will be prepared. I guess it will cause people to talk about me, but believe me, Jim, I am as innocent as can be. I won't tell you who it was until you come home so you won't go to him until we can see you.

"Love
"Mary

"I don't stay at home at night now and I can't hardly stay in daytime."

As soon as appellant read this letter he told his employer his wife was sick and that he had to go home, and left for home as soon as he could fill the gas tank of his car. He found his wife at his father's home, and asked the meaning of the letter. His wife said: "Let Dad tell you," but his father said: "No, May, you tell him." His wife then proceeded to tell him that "A man came down and broke in on me Monday night." The man knocked, but she did not pay any attention, and he knocked again, and she got up and dressed and unlocked the screen door, and asked the man what he was doing there, and he said, "I thought I would come and see you a little bit," and his wife said, "You get out of here, I don't want to see you now or at any other time." The man grabbed her and forced her back in the house, and she told him if he didn't get out her husband would kill him. Deceased answered, "You tell him two can play at that killing game, and I have a gun and will be ready for him." Appellant asked his wife if she had given the deceased any reason "to pull a stunt like that," and she said she had not.

Appellant armed himself and started in search for deceased. When the father was unable to dissuade his son he accompanied him. Within about an hour appellant had killed deceased under conditions which would ordinarily constitute murder in the first degree.

This dissent is not written to defend the "unwritten law," but to correctly apply the written law.

In my opinion, appellant is guilty of voluntary manslaughter, and his life sentence should be reduced to a sentence of seven years, the highest punishment imposed by law for the commission of the offense of voluntary manslaughter.

Section 2981, Pope's Digest, defines voluntary manslaughter as follows: "Manslaughter must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible."

That definition fits this case perfectly. One might have a greater provocation to kill another, but I cannot conceive what it would be unless, indeed, it was that the deceased had consummated the purpose of his assault.

There was here no "cooling time." The authorities upon this question were reviewed in the case of *Arnold* v. *State,* 179 Ark. 1066, 20 S. W. 2d 189, and the holding of the cases there cited was summarized as follows: "Undoubtedly defendant was greatly angered, but anger alone does not suffice to reduce malicious killing to voluntary manslaughter. If this were true, many of the most deliberate killings would be reduced to that grade. There must be a sudden heat of passion aroused by a provocation apparently sufficient to make the passion irresistible, and, even when such a passion has arisen, the degree of homicide is not reduced if there has been time within which a reasonable and ordinary man would have cooled, or reflected, even though he had not cooled."

Within the hour elapsing between the time appellant was advised of the assault upon his wife and the avenge of the assault there was no cooling time. On the contrary, there was an incident which added fuel to appellant's flaming anger. This was that appellant was told by the justice of the peace, to whom appellant applied for redress, that the assailant could only be prosecuted for disturbing the peace. The judicial information given appellant that the law afforded no other redress was certainly not calculated to quiet appellant or to appease his anger.

The majority stress the fact that appellant had not lost the power of speech or of locomotion, and that he

ate some strawberries from a passing truck loaded with them which had stopped at the scene of the killing. The law does not require that anger have a paralyzing effect. It is sufficient that one acts upon a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible. If appellant did not have that provocation, who could have, or what provocation could be said to make an unlawful killing voluntary manslaughter?

Certainly, the testimony of the witness Hortense Hudson, an employee of deceased, adds nothing to the gravity of appellant's crime and does not raise its degree. By her own testimony, her aid as a procuress had been invoked, but she had the grace to admit that she told deceased that she did not think appellant's wife would "date him." Can there be any doubt that deceased went to the home of the appellant's wife with a sinister purpose? Certainly there was no doubt in appellant's mind upon that question. In my opinion, the admission of the testimony of Hortense Hudson was an error which would call for the reversal of the judgment except for the fact that under the undisputed testimony appellant was guilty of voluntary manslaughter.

The innuendo of the testimony of this witness is that deceased went to the home of appellant's wife by invitation, a fact which appellant's wife could not deny, as she was an incompetent witness. But it is not contended that any of that conversation was ever communicated to appellant, and, if it were true, he was unaware of it. He had asked his wife if she had given deceased "any reason to pull a stunt like that," and she had assured him that she had not.

In my opinion, the life sentence should be reduced to the highest permissible sentence for voluntary manslaughter, and I, therefore, dissent. *Jones* v. *State*, 88 Ark. 579, 115 S. W. 166.