Brown *v.* State.

4137                                      132 S. W. 2d 15

Opinion delivered October 9, 1939.

*Luther H. Cavaness, Virgil D. Willis* and *W. F. Reeves,* for appellant.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Asst. Atty. General, for appellee.

Smith, J. Appellant was tried upon a charge of murder in the first degree, alleged to have been committed by killing his father-in-law, John R. Stovall, by striking him with a skein from a wagon axle on the morn-

ing of March 16, 1939, and from the judgment sentencing appellant to a term of twenty years in the penitentiary is this appeal. Only one question is raised on the appeal, and that is whether error was committed in the admission of an alleged confession.

Appellant had only recently married Stovall's youngest daughter, and lived with Stovall as a member of his family. There was no evidence of any ill will between appellant and deceased. On the day of his death Stovall arose about 5 a. m., and went to his lot to feed his mules. A few minutes later appellant arose, and went to the barn to milk the cows, five in number. Stovall returned to the house, and, after staying there a few minutes, again left the house. Appellant testified that he had milked three of the cows, when his wife came out of the house to assist him with the milking, and she discovered an object lying near the yard gate. She ran to the horse lot gate and called appellant, who examined the object which his wife had seen, and discovered that it was the dead body of Mr. Stovall, who had evidently been killed by being struck with the skein. There had been no quarrel, and Mrs. Stovall testified that the only noise she had heard was that of the barking of the dog.

Appellant was naturally suspected, for the reason that apparently no other person had the opportunity to kill Mr. Stovall. Appellant realized that he would be suspected, and there was testimony to the effect that before he had been accused he expressed the hope that no one would think that he had killed "Pop," as he called Mr. Stovall. After discovering Mr. Stovall's body appellant went into the house and told Mrs. Stovall that her husband was dead. Appellant assisted in giving the alarm and in notifying the neighbors. The sheriff and coroner were sent for, and after a large number of persons had assembled some one suggested that bloodhounds be sent for, when appellant said he did not see of what service the dogs would be after so many people had been around the dead body. Stovall and appellant operated a dairy, and appellant had bought a truck used in delivering the milk. A witness testified that he had

heard appellant say a down payment would soon be due on the truck, and that he had only two dollars, and that "Something has to happen between now and then (the day the payment would be due) or I won't have the money to pay it." There was no other testimony tending to show any motive for the crime. Appellant was a high school graduate, and was 26 years old at the time of Stovall's death and a number of the neighbors testified that appellant's reputation was not only good, but was excellent.

Owen Fudge, a member of the State Police Department, was called upon to investigate the crime, and it is apparent from his testimony that he immediately concluded that appellant had killed Stovall, and his subsequent conduct was based upon that assumption. Appellant was arrested, but was not carried to Yellville, the county seat of Marion county, in which county the crime had been committed, but was taken to Harrison, the county seat of an adjoining county.

That night appellant was carried to the office of the prosecuting attorney, where Fudge began his investigation, in which he was assisted by the prosecuting attorney, the sheriff of the county, the chief of police of Harrison, and others. This investigation continued until about 3 or 4 o'clock the following morning. No one was allowed to see appellant except the investigators. His father was denied his request to see his son, and appellant's wife was not permitted to see him. She was, however, permitted to send appellant a note reading as follows: "Dear Harold: I still love you, and believe in you."

After the investigation had proceeded for some time without producing the proper result, the prosecuting attorney came into the office and gave the sheriff a pistol and remarked as he did, "Don't let anyone in," and the sheriff answered, "I have stopped one or two mobs, and I can stop another." This byplay was obviously intended to make appellant believe that he was about to be lynched. As a matter of fact, there was no show of

mob violence, but appellant was allowed to remain under the contrary impression.

Fudge explained his method of investigating as follows: "Q. Tell the court in your own way how you handled him? A. A crime of this nature is usually handled different to ordinary felony or grand larceny. My experience and observations of the smarter investigators than I am is that an investigation administered to a suspect of that nature would be to keep the crime constantly on his mind and hold it there with a moral conversation. That was the procedure taken with this crime. Q. Did you talk kindly or roughly? A. Kindly. When he would ask to change the subject, someone would throw the murder right back in his face, and the normal proceeding was taken in leading up to it."

Upon being asked what this normal proceeding was, the witness testified as follows: "A. For instance, I would tell him, 'Harold, you explain to us who else could have killed Mr. Stovall. Who could have? Who was out there?' He would say: 'It don't look like any one else could.' And I would ask him if Mr. Stovall had not been good to him and he would say that he had been a father to him. I would tell him that he knew he had made a mistake, and didn't he know that he would feel better if he would tell the truth. He would say, 'I am telling the truth.' Q. You necessarily had to accuse him in the line of questioning? A. Yes, sir, in the investigation. Q. That started immediately after you got up to Harrison? A. Yes, sir, I say immediately after dark that night. Q. Didn't you constantly accuse him and hold the accusation before him? A. We asked him to tell the truth throughout. Q. He said he was telling the truth? A. We suspected him. Of course we didn't know. Q. He said he was telling the truth? A. Yes, sir. Q. After he would tell you boys that he was telling the truth didn't it necessarily follow that you would tell him that he was telling a story about it? A. Naturally. Had to hold the crime before him and keep it constantly impressed upon his mind more or less, and accuse him of

it; started in soon after dark and continued until about 4 o'clock the next morning.''

The night long investigation having proved ineffective to procure a confession, it was decided to take appellant to Little Rock, for the reason assigned that there were better facilities for investigation and better investigators in Little Rock, and after having had but little sleep appellant was brought to Little Rock the following day.

The investigation was resumed that night in a room within the walls of the Old Penitentiary Building, used by the State Police as headquarters.

We have not stated, and unless so indicated, will not state any of the testimony of appellant relating to the circumstances under which he finally made his confession, for the reason that the jury may have disregarded his testimony as untrue.

The investigation was resumed in a room filled with the trophies of many raids and arrests made by the police. There were also five death masks, which had been placed on wooden blocks on the wall of the room. These had been made by pouring plaster paris on the faces of criminals who had been executed. There were numerous guns and other weapons on display in glass cases. Appellant testified that he was shown pieces of rubber hose, with handles attached, which he was told were lie detectors; but this testimony was denied by the officers, one of whom testified in regard to the pieces of hose as follows: ''Q. What are the rubber hose they have with those handles on them used for? A. What are they used for? The boys—it is hearsay where they get them. Q. What did they say? A. Said they got them in raiding negro honky tonks. Q. Do the negroes go armed with rubber hose with handles? A. I presume they do. Q. Mr. Fudge, do you know how come them to be in this room? A. That is where all the stuff like that is kept.''

In this environment, the investigation was resumed on the second night after appellant's arrest. The same method of investigation used at Harrison was employed

in Little Rock, with the additional fact that appellant was told that his wife had been arrested for complicity in the crime, and it was repeatedly stated to him that no man, who was a man, would permit his wife to suffer for a crime which he had himself committed. It was not true that appellant's wife had been arrested, but appellant was allowed to remain under that impression. One of the officers, when asked whether appellant was told that his wife would suffer, answered, ''Likely so. Of course, they told him how dirty the crime was, and that there would not be anything in a man to try to put it off on her.'' There was no testimony whatever to the effect that appellant had said anything to implicate his wife.

The investigation in Little Rock continued until after midnight, and appellant finally admitted that he had killed Mr. Stovall. He was asked to write a confession, and was given a pencil and paper for that purpose. He took the pencil, but declined to write or sign a confession, protesting that he was innocent.

The prosecuting attorney, who had been present during the investigation at Harrison and who accompanied the party to Little Rock, was sent for. He testified that appellant admitted having killed Mr. Stovall, but that appellant asked, ''If I sign a confession, will you leave my wife out of this? If I sign a confession and plead insanity, what will be done with me? A. I cannot promise you anything; the only thing I can tell you is that it is best to tell the truth.''

There can be no question as to what was meant by telling the truth. It could mean only that nothing but a confession of guilt would be accepted as the truth, as appellant had, during many hours, iterated and reiterated his innocence.

The prosecuting attorney was asked: ''Q. You didn't offer him any leniency?'' He answered: ''A. I guess I did to this extent. Q. What extent? A. I told him it would be better to tell the truth, and I would feel more like making recommendations for a man that told the truth.''

The investigation ended in this manner. An officer testified: "When we went back into the room, Mr. Jones (the prosecuting attorney) told me that the boy wanted to trade out; he wanted to plead insanity, and he says, 'I have no right to do that,' and he asked him not to prefer charges against his wife, and he says, 'I have no right to do that either,' and the boy backed out." In other words, when appellant was unable to secure immunity for his wife, which was not required, as his wife had not been arrested or accused, although he was unaware of that fact, appellant repudiated the confession.

The officer further testified: "After he (appellant) made this last denial, the assistant chief says, 'Let's take him to jail, I believe he is going crazy.' "

In the recital of the circumstances under which the confession was obtained, we have stated only the testimony offered by the state.

The trial court pursued the practice which we have many times approved in regard to the admission of the confession where there is a question as to whether it was free and voluntary. After hearing this testimony as a preliminary matter, he permitted its introduction before the jury. In other words, the judge submitted to the jury the question whether the confession had been freely and voluntarily made, and the jury was told that unless they so found, the confession should be disregarded and not considered for any purpose.

In many instances, where the accused is confronted with a confession which he cannot deny having made, he insists that it was not freely and voluntarily made. But that insistence does not render the confession inadmissible, where there is testimony to the effect that it was in fact, freely and voluntarily made. In such cases the practice approved by us, which was followed in the instant case, is for the court to hear the testimony in the absence of the jury as to the circumstances under which the confession was given, and if there is a substantial question as to whether it was freely and voluntarily made, to submit that question of fact to the jury, after admon-

ishing the jury to disregard the confession unless it was found to have been voluntarily made.

In this case the officers testified that the confession was, in fact, freely made; but such testimony, in view of the undisputed facts herein recited, proves only that they misapprehended what it takes to constitute duress. Under the circumstances here detailed, it was, in our opinion, error to have admitted the confession, as it does not appear to have been freely and voluntarily made.

In the case of *Spurgeon v. State*, 160 Ark. 112, 254 S. W. 376, it was said: "Of course, the officers had a right to interrogate the accused concerning his participation in the offense, but they had no right to coerce him into a confession by a continuous inquisition persisted in to the extent of exhausting him physically and mentally and overcoming his will. Of course, there was testimony in this case which tended to show that the confession was not voluntary, but we cannot say that there is an entire absence of testimony tending to show that the confession was voluntary and that the inquisition was not persisted in long enough to exhaust defendant mentally and physically and overcome his will."

In view of the conflict appearing in that case as to whether the confession had been voluntarily made, it was held proper for the court to have submitted that question to the jury. Here, it appears, from the testimony on the part of the state, ignoring that on behalf of the defendant, that the confession was not freely and voluntarily made, and it was error, therefore, to have admitted it to the jury.

The law on the subject was declared by Chief Justice McCulloch in this Spurgeon Case, *supra,* by quoting from the case of *Dewein v. State,* 114 Ark. 472, 170 S. W. 582, as follows: " 'It has been said that no general rule can be formulated for determining when a confession is voluntary, because the character of the inducements held out to a person must depend very much upon the circumstances of each case. Where threats of harm, promises of favors or benefits, infliction of pain, a show

of violence or inquisitorial methods are used to extort a confession, then the confession is attributed to such influences. It may be said also that, in determining whether a confession is voluntary or not, the court should look to the whole situation and surrounding of the accused.' *Dewein* v. *State,* 114 Ark. 472, 170 S. W. 582.''

Tested by the rule thus stated, we think the admission of the confession was error, and for that reason the judgment will be reversed and the cause remanded for a new trial.