ALBERT HARRIS *v.* STATE OF ARKANSAS

5314                                                    425 S. W. 2d 293

Opinion delivered March 11, 1968

[Rehearing denied April 8, 1968.]

*George Howard,* for appellant.

*Joe Purcell,* Attorney General; *Don Langston,* Asst. Atty. Gen., for appellee.

LYLE BROWN, Justice. Appellant Albert Harris received a death sentence in April 1963. That sentence was here affirmed in *Trotter* and *Harris* v. *State,* 237 Ark. 820, 377 S. W. 2d 14 (1964). Certiorari was denied by the United States Supreme Court. Shortly thereafter, *Jackson* v. *Denno,* 378 U. S. 368 (1964) held that Jackson's case should be remanded because the same jury passed on both his guilt and the voluntariness of his confession. On the strength of that pronouncement in *Denno,* Harris filed a petition in the United States District Court, alleging error because the record in his trial showed that the voluntariness of his alleged confessions, together with the question of guilt or innocence, were submitted to the same jury. Pursuant to the directive of the Federal Court, the State trial court conducted a hearing to determine the voluntariness of Harris' oral admissions. Harris brings this appeal from an adverse ruling.

It is not necessary to reconstruct the entire case. The facts are detailed in our *Trotter* and *Harris* deci-

sion. We are here concerned with two rather brief instances in which Harris is alleged to have made admissions pointing to his guilt. The first episode occurred at his home just before daylight and about four hours after the rape. As a result of there being questioned by officers, Harris was placed under arrest for investigation and taken to the city jail in Monticello. About two hours later he was there questioned by Jerry Wilson, the escort of the rape victim, who went to the jail for the purpose of identifying the prisoner. For clarity the testimony concerning those two episodes will be discussed in sequence.

1. *The Incident at the Harris Home.* After apprehending Trotter, the officers received information that Harris and Trotter had been together that night. Two men were alleged to have committed the crime in concert. Sheriff Towler, State Patrolman Griffin, and City Officer Newton proceeded to Harris' home in Monticello. They had no search warrant. Harris and his wife were in bed and the lights were out. After several knocks on the door the wife responded and the officers entered. There is considerable variance between Harris' and the State's version of the conversations and transactions.

Harris was his only witness at the *Denno* hearing. The essential parts of his testimony were as follows:

"That morning when they come to my house and knocked on the door, my wife opened the door and they just came on in. Ain't nobody asked them in. I was laying on the bed . . . . Lieutenant Griffin . . . said 'nigger, get up out of that bed.' I just got up and he had his hand in his coat pocket and I seen a pistol. The Sheriff told him that there ain't going to be no rough stuff . . . . The Sheriff, he said he knew my wife, he said he's been knowing her so many years and wanted to talk to us private. . . . We went back in the kitchen and closed the door. He said 'Albert, you are in a bad fix.' I said, 'Mr.

Jack, what do you mean by a bad fix?' He said that Trotter said that me and him attacked Joyce Binns. . . . He told me, 'Trotter is a bad boy, he's getting into trouble all the time.' He said, 'I can help you, but I can't help him.' . . . I said, 'I want to see an attorney.' He said, "Well, you give me time and you'll see one.' He never advised me of no kind of rights at all. He told me, he said, 'If you want any help, you got to cooperate with me.' I said, 'I don't see why I have to cooperate with you when I haven't done anything. I've been in bed with my wife.' . . . He told my wife, 'I'm going to take him down to the city hall and I'll bring him right back.' He said he was carrying me down for investigation. . . . I haven't seen no watch, no more than my wife's watch. . . I didn't have no watch in my wallet in the first place. . . . I never admitted nothing to no one.''

On cross-examination Harris testified he was not struck; no one cursed him; the Sheriff did not speak disrespectfully; and the discussion was in normal tones.

The State offered as witnesses the three officers who went to the Harris home. The Sheriff's version was that the wife, who answered the door, was advised that they wanted to talk to her husband and that she invited them in the house; the Sheriff had known Harris' wife a number of years; Harris propped himself in bed and the Sheriff inquired where he had been during the night and with whom he came home; Harris replied that he had been to Dermott and had ridden back to Monticello with one Sonny Hall; the Sheriff asked to see the clothing he had worn during the night; Harris pointed to a pair of trousers on a hanger in the corner; inspection disclosed that they had not been recently worn; Harris was admonished to produce the right clothing; he got out of bed and started to the kitchen and the Sheriff and Harris' wife followed; Harris picked up a pair of trousers from a table and handed them to the Sheriff;

blood was observed on the fly of the pants; when the Sheriff took the pants he felt a billfold in the pocket with a "bulge" in it. The bulge proved to be a lady's wristwatch. Harris' wife stated that it was not her watch; at that point the Sheriff told Harris the presence of the watch required "some explaining"; the Sheriff told Harris "he didn't have to tell me anything and that if he did it probably would be held against him in court"; Harris said he was willing to tell him and explained that he received it from Orion Trotter; he admitted he was with Trotter at the time of the crime; that the two of them put Joyce Binns in Trotter's car and drove away; he said he drove the car but denied having raped the girl; the Sheriff then opened the door and called in the other two officers; in their presence he again advised Harris of his rights and asked Harris if he would repeat his statement.

Officers Newton and Griffin corroborated the testimony of Sheriff Towler. Officer Newton's testimony varied with that of Towler and Griffin with respect to Sheriff Towler having a private conference with Harris. Newton's best recollection was to the effect that all present heard the first conversation; however, he conceded that the lapse of time (four years) could have well affected his recollection of details. The only difference of note is that Sheriff Towler made no reference to suggesting to Harris that he could talk to a lawyer; on the other hand, the other two officers testified they heard the Sheriff so advised Harris.

2. *The Incident at the City Jail.* After being questioned at his home, Harris was taken to the Monticello city jail at approximately six o'clock of the same morning. There Officer Newton was placed in charge of the prisoner. Harris testified the cell was comfortable and he was not abused.

Jerry Wilson, a college senior and escort of Miss Binns, was treated for injuries received in resisting her

assailants and was discharged. He learned of Harris' arrest in approximately two hours after Harris was jailed. Apparently on his own initiative he went to the jail to see if he could identify the accused. Jerry testified that he was admitted "reluctantly" by Officer Newton.

> ". . . I looked through the door at the defendant Harris. I asked him had he ever seen me before. He said, 'Yes, I saw you last night.'
>
> "Q. That was your conversation?
>
> "A. Yes, it was. I asked him again if they planned what had happened and he said, 'No, we didn't.' "

The only other statement Jerry recalled was by Officer Newton. As the two men were about to leave the jail, Newton advised Harris to stand away from the window "for his own safety." Officer Newton corroborated all of Jerry Wilson's testimony. The only variance in their versions of the incident was that Newton said he gave the admonition about Harris standing in front of the window *before* Harris' conversation with Jerry.

Harris gave a different version of the incidents at the jail. Summarizing, he said when he was brought to jail, Newton told him to "stay away from the window if you don't want your head blowed off, because people are mad around here"; shortly, Jerry Wilson came to the jail "and was raising sand"; Newton took Jerry by the arm and opened the door to where Harris and Jerry could see each other. Harris continued:

> ". . . The white boy asked did I know him and I said, 'No, this is the first time I ever seen you.' He said, 'You don't know me from last night?' I said, 'How can I know you. I was at home.' . . .

Officer Newton told me, he said, 'Be sure and stay away from that window, because people around here is mad.'"

It was conceded that no "warnings" were given Harris as a preface to the two questions propounded by Jerry Wilson. Officer Newton was in uniform and armed.

When the voluntary nature of a confession is disputed on federal constitutional grounds, the weight ordinarily given to a factual determination by the trial judge cannot be applied. It becomes the duty of the appellate court "to examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Davis* v. *North Carolina*, 384 U. S. 737 (1966). That does not mean that the findings of the trial judge must be shunned. They are entitled to considerable weight in resolving evidentiary conflicts and to respectful consideration on the crucial issue of voluntariness. However, that respect cannot be permitted to frustrate the independent responsibility of the appellate court to determine the voluntariness of a confession. See *Haynes* v. *Washington*, 373 U. S. 503, 515 (1963). Because of the recited requirements we have searched the entire record and narrated the essential testimony.

The prerequisites for the admission in evidence of any statements made by a defendant when he is in custody of officers are found in *Boyd* and *Byrd* v. *State*, 230 Ark. 991, 328 S. W. 2d 122 (1959). There is a presumption that it is involuntary; and the burden is on the State to show the statement to have been voluntary, that is, freely and understandably made without hope of reward or fear of punishment. In making those determinations the court looks "to the whole situation and surroundings of the accused." Although *Miranda* v. *Arizona*, 384 U. S. 436 (1966), was subsequent to the defendant Harris' trial, the nonretroactivity of *Miranda* "does not affect the duty of courts to consider claims

that a statement was taken under circumstances which violate the standards of voluntariness which had begun to evolve long prior to our decisions in *Miranda* and *Escobedo* . . ." *Davis* v. *North Carolina, supra.*

The record in this case has been examined in light of all the cited precedents and we are convinced that the trial court was correct in holding Harris' statements to have been voluntary. Further, we have examined the cases, state and federal, cited by appellant. Those cases were reversed because confessions were tainted with such incidents as prolonged questioning, inspiring fear, questioning mentally retarded persons, and holding out hope of clemency. Appellant relies heavily on *Payne* v. *State,* 231 Ark. 727, 332 S. W. 2d 233 (1960); and *Payne* v. *Arkansas,* 356 U. S. 560 (1958). In *Payne* v. *Arkansas* the court emphasized the *totality* of treatment of a mentally dull 19-year-old youth. He was arrested without a warrant, did not have a hearing before a magistrate, was not advised of any rights, held incommunicado for three days, denied food for long periods, and was told that a mob was approaching.

A comparison of Harris' overall situation with that of Payne is appropriate. But first we must resolve the conflict in evidence. For three reasons we think the State's evidence is more credible: (1) To say that Harris, under his own testimony, ever became excited, would be without foundation; (2) he was contradicted in most of his accusations of mistreatment by from two to three witnesses; and (3) the trial judge is "closest to the trial scene and thus afforded the best opportunity to evaluate contradictory testimony." *Haynes* v. *Washington, supra.*

Harris' age and education are not shown in the record. It does show him to have been a married man. The manner in which he conducted himself under examination leaves no doubt as to his mental alertness. Harris' arrest and the search of his apartment are dis-

cussed in *Trotter* and *Harris* v. *Stephens*, 241 F. Supp. 33 (1965). Harris attacked the legality of his arrest and the search. Judge Young rejected both points, and we think correctly so. With reference to being advised before making any statement, three witnesses testified Harris was informed that he did not have to make any statement and that if he did, that statement could be used against him in court; and that after being so advised, Harris stated he was willing to explain his participation. Further, two witnesses testified that he was asked if he wanted to first talk to a lawyer. Unlike Payne, Harris made his statements in the course of brief questioning. There is no credible evidence of threatened mob violence. Harris was advised at the jail to stand away from the window for his own safety. That precaution could just as well have been motivated by the enormity of the crimes which had been committed, namely, the armed robbery of two persons and the criminal assault of one of them. If Harris heard or saw a crowd he did not so testify. Officer Griffin was asked by Harris' counsel whether people were milling around outside. He answered, "Just some people out there. I don't think there were too many at that time."

Appellant contends that his statements at the city jail were induced by threats of mob violence, and further that he was not advised of his right to remain silent. When Jerry Wilson, a private citizen as opposed to an officer, went to the jail to see Harris, it was for the purpose of identification. We have not been cited to any rule of law which would require that Harris be informed that Jerry was about to ask him a question. If Jerry had an intent at the time he entered the jail to ask a question, we are convinced that Officer Newton was not aware of it. In fact, Jerry requested "to *see* the little Negro." Notwithstanding Harris testified Jerry came in "raising sand," no fear was aroused in Harris. He testified that he told Officer Newton to "let him on in the cell."

Other than questioning the voluntariness of Harris' admissions, only one other point is raised. Sheriff Towler's death intervened between the jury trial in 1963 and the Denno hearing in 1967. The trial judge permitted the introduction of Sheriff Towler's testimony which was given at the trial. Harris was adequately represented at the 1963 trial and his counsel had the opportunity to cross-examine the Sheriff. Harris' present counsel contends that his inability to cross-examine Sheriff Towler at the hearing deprives his client of due process. We are cited no authority. All the statutory requirements for the admission of testimony from a prior trial were present. The original transcript was introduced, the death of the witness was established, the defendant and his counsel were present at the 1963 trial, and they had the opportunity to cross-examine the witness. Ark. Stat. Ann. § 28-713 (Repl. 1962).

Affirmed.

BYRD, J., disqualified and not participating.