William Goodwin TUCKER *v.* STATE of Arkansas

CR 76-27                              549 S.W. 2d 285

Opinion delivered April 25, 1977
(In Banc)

506

*Pollard, Cavaneau & Hatfield,* for appellant.

*Jim Guy Tucker,* Atty Gen., by: *Jackson Jones,* Asst. Atty. Gen., for appellee.

EDWARD P. JONES, Special Justice. William Goodwin Tucker (also known as Billy) age sixteen was convicted of

killing his mother and sentenced to ten (10) years imprisonment for second degree murder. His appeal contends that a confession and subsequent admission made by him were not voluntarily obtained.

The evidence indicates that a few minutes after 12:00 a.m. on April 3, 1975, Billy Tucker walked approximately three blocks from a friend's home in Judsonia, Arkansas to the home of Billy Tucker and his mother. A short time later he returned to his friend's home and told the people there that his mother had been killed. Law enforcement authorities were contacted and the investigation reflected that Mrs. Tucker, the mother of Billy Tucker, had been beaten and stabbed to death. During the next two hours Billy Tucker was present at his home with numerous law enforcement officials and was not questioned until approximately 2:00 a.m., when Officer Doug Fogley of the Arkansas State Police arrived at the Tucker home. Officer Fogley advised Billy Tucker of the rights afforded him under the U. S. Constitution and obtained from him a written waiver of those rights. At that time Billy Tucker denied any involvement in the death of his mother.

At approximately 4:00 a.m. the Defendant was placed in a cell in the juvenile section of the jail at Searcy, Arkansas. At approximately 6:00 a.m. Officer Fogley took the Defendant from the cell and fingerprinted and photographed him. A trace metal detection test or TMDT was performed to determine whether or not Defendant's hands had come into contact with metal.

Following that test Officer Fogley took the Defendant to an office and interrogated him for approximately one hour. During this interrogation, attended only by Officer Fogley and the Defendant, Officer Fogley purposely created, according to his own testimony, a friendly relationship with the Defendant. The Officer advised the Defendant that the trace metal detection test indicated that the Defendant's hands had come in contact with metal objects during the preceding hours and further advised the Defendant that a latent fingerprint had been found on broken glass near the body of the deceased and that the print would probably turn out to be

Defendant's. It is clear that the purpose of advising the Defendant of the metal test results and the fingerprint was to create the impression with the Defendant that physical evidence existed proving his involvement and guilt. At this interrogation of Billy Tucker, Officer Fogley knew but did not tell the Defendant that the metal test was by no means conclusive evidence that the Defendant had stabbed his mother. He also knew but did not advise the Defendant that the print found on the glass piece was only a partial print and probably could not be determined to belong to the Defendant. It is interesting to note that even if the print had been Defendant's it also would not have been convincing evidence as to the guilt of the Defendant since the Defendant lived in the house and could easily have touched the glass other than while killing Mrs. Tucker.

Officer Fogley then described to the Defendant his theory of how the crime was committed by the Defendant. Thereafter Defendant indicated that he desired to make a statement and after a witness in addition to Officer Fogley was present the Defendant Billy Tucker admitted the killing of his mother and further described two knives used. After giving this statement the Defendant accompanied the officers to the kitchen of the Tucker home and indicated to the officers the two knives involved.

Billy Tucker was sixteen years of age at the time of his confession and age is a factor to be considered by this Court in determining the voluntariness of a confession.

The Defendant was living with his mother in Judsonia, but his father, William A. Cook, was living in North Little Rock, Arkansas. After hearing of the death of Mrs. Tucker the father traveled from North Little Rock to Judsonia and talked with his son prior to the time Billy Tucker was taken to jail. Mr. Cook testified that he was not aware that Billy was a suspect and also was not aware that he was taken to jail until after the confession was made by his son. He spoke to Officer Fogley at the scene of the crime but did not advise the Officer that he did not want the Officer to speak to his son nor did he make any effort to secure the services of an attorney for his son.

The Defendant did poorly in school. There is substantial evidence in the record as to the mental capabilities and capacity of Billy Tucker.

These three factors, namely, age, lack of a parent or some other adult present during interrogation of the Defendant, and the mental capability of the Defendant are all relevant and are important circumstances surrounding the confession of this Defendant.

The other events which are relevant to the voluntariness of the confession concern what occurred following the death of Mrs. Tucker. Defendant urges that the explanation of Constitutional rights and subsequent waiver thereof occurred in an atmosphere of "noise, confusion and milling about by persons not directly connected with investigation of the crime". He submits that he was impaired by a lack of sleep and that the interrogation which occurred at 6:00 a.m. in the morning was unjustified. Defendant also contends that no voluntary confession occurred because of the length of the interrogation, the false friendly relationship created by the interrogating officer and the trickery and false statements made to the Defendant by the officer.

Undoubtedly, the atmosphere and scene at the Tucker home during the initial investigation of the death and questioning of the Defendant were not ideal circumstances for the interrogation of a witness. However, there is no evidence in this record that the Defendant was not able to hear and understand his rights as they were explained to him or that he did not understand and intelligently waive these rights. As previously mentioned, Defendant at that time denied any involvement in the crime.

It may be true that Defendant was tired from lack of sleep at 6:00 a.m. on April 3, 1975 when the confession was made. But we cannot conclude and the evidence does not indicate that the interrogation of approximately one hour caused truthfulness to be compromised by fatique.

Defendant urges that the several factors set forth above

constitute a "totality of circumstances surrounding the confession", which, when considered together, render this confession and subsequent admissions involuntary. This appeal argues that when all circumstances relating to his confession are examined the conclusion must be reached that the State has failed in its burden of showing a knowing and intelligent waiver of Defendant's right to counsel and right to remain silent under the principles set forth in *Miranda* v. *Arizona*, 384 U.S. 470 (1966). The Defendant contends that allowing the confession and subsequent admission concerning the two knives into evidence was error.

The right of an individual to remain silent and to have available the assistance of counsel is well established. When an in-custody confession is obtained and the voluntariness of a confession challenged we make an independent determination of the issue from a review of the entire record and in making such a review look to the totality of the circumstances surrounding the confession. However, we will not set aside the finding of voluntariness by the trial court unless the finding is clearly against the preponderance of the evidence. *Degler* v. *State*, 257 Ark. 388, 517 S.W. 2d 514 (1974).

In *Moseley* v. *State*, 246 Ark. 358, 438 S.W. 2d 311, we concluded that youth of a defendant does not prevent the giving of voluntary confession or the intelligent, knowing waiver of his Constitutional rights. In *Shepherd* v. *State*, 239 Ark. 785, 394 S.W. 2d 624 *cert. den.*, 387 U.S. 923, 87 S. Ct. 2038, 18 L. Ed. 2d 977; *Dewin* v. *State*, 114 Ark. 472, 170 S.W. 582; and *Mitchell* v. *State*, 206 Ark. 149, 174 S.W. 2d 241, lack of education standing alone has been held insufficient to establish that a confession or waiver of rights was involuntary. Although some states require a parent, counsel or guardian present when a juvenile is questioned, such a requirement does not exist in Arkansas. *Moseley* v. *State*, supra. Therefore, although relevant, the evidence regarding age, mental capability and lack of adult protection is not persuasive to find an involuntary confession.

The crucial aspects of this case and certainly the two matters which have been most emphatically argued by this Defendant concern the relationship between Defendant and

Officer Fogley created and cultivated by Officer Fogley and the statements made by Officer Fogley to the Defendant concerning fingerprints and the trace metal detector test. It is asserted that these two elements, coupled with the events previously discussed above, bring into being a "totality of circumstances" rendering the confession involuntary. We do not agree with this conclusion.

Officer Fogley testified that after fingerprinting and photographing the Defendant and conducting the metal test he took the Defendant to his office and they talked together alone for one hour prior to the confession. That scene is described by Officer Fogley and in essence substantiated by the testimony of Defendant. Officer Fogley attempted to gain the confidence of the Defendant. He described his relationship with Defendant as that of a "dutch uncle." He stated that he attempted to "love him to death," and that the information concerning the fingerprints and the metal test were probably a "ruse" and "con." This friendly relationship is seen by Defendant in his appeal as creating a notion in the mind of Defendant that by making a confession he could expect leniency and that the fingerprint and metal detection information was a trick or artifice which violates notions of fair play and which are impermissible in Arkansas. He cites as authority *Brown v. State,* 198 Ark. 921, 132 S.W. 2d 15 (1939). As a review of that case will show, the Defendant in *Brown* was clearly subjected to duress and coerced into making the purported confession. Such simply did not occur with the Defendant here, Billy Tucker. Limitations on the use of trickery and deceit by law enforcement officers have been considered by the United States Supreme Court as well as by courts of other jurisdictions. In *Frazier v. Cupp,* 394 U.S. 734 (1969), the opinion by Justice Marshall stated:

> "After the questioning had begun and after a few routine facts were ascertained, petitioner was questioned briefly about the location of his Marine uniform. He was next asked where he was on the night in question. Although he admitted that he was with his cousin Rawls, he denied being with any third person. Then petitioner was given a somewhat abbreviated description of his Constitutional rights. He was told that he

could have an attorney if he wanted one and that anything he said could be used against him at trial. Questioning thereafter became somewhat more vigorous, but petitioner continued to deny being with anyone but Rawls. *At this point, the officer questioning petitioner told him, falsely, that Rawls had been brought in and that he had confessed.* Petitioner still was reluctant to talk, but after the officer *sympathetically* suggested that the victim had started a fight by making homosexual advances, petitioner began to spill out his story. Shortly after he began he again showed signs of reluctance and said, 'I think I had better get a lawyer before I talk any more. I am going to get into trouble more than I am in now.' The officer replied simply, 'You can't be in any more trouble than you are in now,' and the questioning session proceeded. A full confession was obtained and, after further warnings, a written version was signed." (Emphasis added.)

The Court concluded:

"The fact that the police misrepresented the statements that Rawls had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible."

In the case of *Moore* v. *Hopper*, 389 F. Supp. 931 (M.D. Ga. 1974) the court was asked to determine whether or not a false statement to an accused by a law enforcement officer that the murder weapon had been obtained, was such fraud, deceit or trickery as to cause a subsequent confession to be inadmissible. There the court concluded that confessions are not inadmissible when obtained by such methods, provided the means employed are not calculated to procure an untrue statement and provided further than the confession is otherwise freely and voluntarily made. See also *Moore* v. *State*, 230 Ga. 839, 199 S.E. 2d 243 (1973); *Hudson* v. *State*, 153 Ga. 695, 113 S.E. 519.

Therefore, we conclude that the friendly relationship created by Officer Fogley in this case did not cause a false hope of leniency in this Defendant. Furthermore, we also con-

clude that the misleading statements concerning the finger-
print did not prompt or cause Billy Tucker to make an un-
truthful confession.

In summary, we find that when considering the "totality
of circumstances" surrounding the obtaining of the confes-
sion of Billy Tucker that the cumulative effect of the par-
ticular characteristics of this individual Defendant as well as
the events relevant to and surrounding his confession do not
constitute duress or coercion. This Defendant was advised of
his right to remain silent and his right to counsel but did not
choose to avail himself of those opportunities. Actually, his
own statement reflects that he was entirely familiar with the
procedure of being "given his rights" by police officers,
stating that on prior occasions he "wouldn't doubt" but that
his rights had been explained to him more than six times and
that he understood them even before they were explained on
the occasion in question.

This judgment is affirmed.

FOGLEMAN and HOLT, JJ., dissent.

HICKMAN, J., not participating.

JOHN A. FOGLEMAN, Justice, dissenting. I must respect-
fully dissent from the affirmance of this conviction and the
refusal of the court to hold the confession in this case to be in-
voluntary and the subsequent admissions of Billy Tucker the
fruit of that poisonous tree. The court has given lip service to
the rule first stated in *Harris v. State,* 244 Ark. 314, 425 S.W.
2d 293, and almost monotonously repeated since then, i.e.,
that this court makes an independent determination of the
voluntariness of a confession from the totality of the cir-
cumstances; however, the majority has failed to face up to the
"totality of the circumstances," being content to separately
view each circumstance in isolation, as if there were no other
circumstances, and say of each, one by one, this did not
render the confession involuntary. This was done somewhat
like examining a wagon wheel by removing each spoke, one
by one, viewing it and saying, "Why, this is not a wheel!" and
repeating the process until all have been removed, examined

and discarded because it is not a wheel, and then, viewing the detached rim and exclaiming, "Behold, this is not a wheel, at all; it is only a large hoop!" If instead, the spokes had been inserted in the hub and the rim (each a circumstance), the assembled whole (or totality of the circumstances) would have obviously been a wheel.

If the totality of the circumstances is the test, then we should face up to our responsibility, however distasteful it may seem, and say that this confession was involuntary or frankly say that the "independent determination, based on the totality of the circumstances" is no longer suitable and we will only make an independent determination of voluntariness by examining the circumstances one by one, and if no one circumstance makes a confession involuntary, then voluntary it shall be. The rule of *Degler v. State,* 257 Ark. 388, 517 S.W. 2d 515, of which I was the prime advocate (Fogleman, J., concurring in *Vault v. State,* 256 Ark. 343, 507 S.W. 2d 111) was not adopted as a screen behind which the court could shed its responsibility to perform the duty it assumed in *Harris.* Any such intention is negated by the language of *Degler.* In *Harris,* we said that the respect and weight to be accorded to the factual determination by the trial judge cannot be permitted to frustrate the independent responsibility of this court to determine the voluntariness of a confession. I fear the majority has forgotten.

I cannot disagree with the majority in viewing each circumstance in isolation, but when I assemble all the circumstances, their totality can logically result only in a finding that the confession was involuntary. Viewing the totality of the circumstances is no innovation in Arkansas law resulting from a new interpretation of the United States Constitution by the United States Supreme Court. Over sixty years ago, this court said in *Dewein v. State,* 114 Ark. 472, 170 S.W. 582:

> It may be said, also, that in determining whether a confession is voluntary or not the court should look to the whole situation and surrounding of the accused. Hence it is proper to consider his age, the strength or weakness of his intellect, the manner in which he is questioned, the fact he is in jail, and everything connected with his situation. ***

That rule has been followed until today. See *Brown* v. *State,* 198 Ark. 920, 132 S.W. 2d 15; *Porter* v. *State,* 206 Ark. 758, 177 S.W. 2d 408; *Moore* v. *State,* 229 Ark. 335, 315 S.W. 2d 907, cert. den. 358 U.S. 946, 79 S. Ct. 356, 3· L. Ed. 2d 353; *Watson* v. *State,* 255 Ark. 631, 501 S.W. 2d 609 and cases cited.

Enumerating each of the circumstances that may constitute a part of the totality is virtually impossible, but we have spoken of critical factors many times. We spoke of many of them in *Watson* v. *State,* supra, where we said:

> Among the factors to be considered in determining this issue are: the age and the intellectual strength or weakness of the defendant, the manner in which he is questioned, the presence or absence of threats of harm or inducements in the form of promises or favor (*Dewein* v. *State,* supra; *Williams* v. *State,* 69 Ark. 599, 65 S.W. 103; *Barnes* v. *State,* 217 Ark. 244, 229 S.W. 2d 484), and the delay between the advice of constitutional rights required by Miranda and the giving of the confession. *Summerville* v. *State,* 253 Ark. 16, 484 S.W. 2d 85; *Scott* v. *State,* 251 Ark. 918, 475 S.W. 2d 699. Where threats of harm or promises of favor or benefit are used to wrest a confession, it may be attributed to those influences. *Brown* v. *State,* 198 Ark. 920, 132 S.W. 2d 15. In order to be admissible, a confession must be free from official inducement proceeding either from hope of gain or the torture of fear. *Bullen* v. *State,* 156 Ark. 148, 245 S.W. 493. Holding out to a simple person that she would be awarded a very light punishment, if she confessed having stolen money, has been held sufficient inducement to make her confession involuntary and its admission into evidence reversible error. *Porter* v. *State,* 206 Ark. 758, 177 S.W. 2d 408.

Of course, a defendant's youth, standing alone, does not prevent his giving a voluntary confession or knowingly waiving his constitutional rights. *Mosley* v. *State,* 246 Ark. 358, 438 S.W. 2d 311. But it is a circumstance which is a factor. Neither diminished mental capacity nor lack of education will suffice to render a confession involuntary. *Sheppard* v. *State,* 239 Ark. 785, 394 S.W. 2d 624, cert. den. 387 U.S. 923,

516

87 S. Ct. 2038, 18 L. Ed. 2d 977; *Dewein* v. *State*, 114 Ark. 472, 170 S.W. 582; *Mitchell* v. *State*, 206 Ark. 149, 174 S.W. 2d 241. But both are circumstances which may be factors. The lack of parental advice is not a prerequisite to a voluntary confession, but is a circumstance to be considered. Length of interrogation will not invalidate a confession. *Vaughn* v. *State*, 252 Ark. 505, 479 S.W. 2d 873. But this is another circumstance to be considered. Persistent questioning based upon the interrogating officer's assumption of the prisoner's guilt will not make a resulting confession involuntary. *Greenwood* v. *State*, 107 Ark. 568, 156 S.W. 427. It can be a significant circumstance. The interrogating officer's promise to help, if not conditioned upon a confession, will not be sufficient to invalidate a confession. *Hargett* v. *State*, 235 Ark. 189, 357 S.W. 2d 533; *Crosnoe* v. *State*, 190 Ark. 691, 80 S.W. 2d 625. But it is a pertinent circumstance. Deception by the officer, standing alone, would not invalidate an otherwise voluntary confession, if the means employed are not calculated to procure an untrue statement. *Frazier* v. *Cupp*, 394 U.S. 731, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969); *McGee* v. *State*, 451 S.W. 2d 709 (Tenn. Crim. App., 1969). see also, *Johnson* v. *State*, 378 S.W. 2d 76 (Tex. Cr. App., 1964). But it is another circumstance to be considered. In *Dewein*, this court, quoting from *Greenwood* v. *State*, supra, 107 Ark. 568, said:

> *** Where a confession is obtained from defendant by persistent questioning by officers, but without deception, threat, hope of reward, or inducement of any kind, it is admissible as a voluntary confession.

When we consider the totality of the circumstances, all are relevant. See *Kasinger* v. *State*, 234 Ark. 788, 354 S.W. 2d 718, and cases cited. And all are present. And more, too.

Billy was 16 years, 3 months of age, when he confessed. He had been enrolled in school only through the seventh grade, which he had repeated. Even though his IQ score was 99 (average), the composite score of his achievement tests indicated that he had been performing in school only on the fourth grade level, and, significantly, had always ranked low in reading and English. A police officer described him as "a

little off." He apparently had a problem with drugs. His father, a colonel in the National Guard, had never been married to his mother, with whom Billy lived. About midnight, Billy reported to some neighbors that his mother had been killed. He called his father, who lived some miles away. The father did not come then because he did not recognize Billy's voice and thought the call was an "April Fool" prank. An officer at the scene described Billy as scared, frightened, upset and worried. Billy expressed concern to some of the investigating officers when his father did not arrive. The father came when the coroner called him. The father found Billy distraught and disturbed and tried to "quieten" him down. The father talked with Criminal Investigator Doug Fogley. Thereafter, Billy's father left and returned home without anyone telling him or his otherwise learning that Billy was a suspect. He did not learn of Billy's arrest until after Billy's confession, although he had remained at home until 6:00 a.m., when he went immediately to his office at North Little Rock. He received no calls at either place and called the White County officials after Billy had confessed.

Billy was first questioned at 2:25 a.m. by Officer Fogley who described the interrogation substantially as follows:

He told Billy he wanted to ask him some questions, then stated and explained his rights under the United States Constitution. He told Billy that it was required that he read the rights form to every suspect who is to be questioned. There was quite a lot of milling around by officers and others in the room at the time. After stating appellant's rights, Fogley took him to a quieter room for interrogation. He recalled that Billy told him that he did not know what happened. He had come home from playing cards and found his mother dead. He said he didn't know why anybody would kill his mother and he did not know who could have done it. In explaining a bleeding cut on his thumb, Billy told Officer Fogley that he cut his thumb on some glass when he first came in the room and found his mother and that there was glass "all over." He said he got blood on his clothing when he was checking his mother. When this interrogation was concluded, Fogley told Billy that he probably would want to interview him later.

Billy was taken to the White County jail and placed in the juvenile quarters therein at 4:00 a.m.

After completing his investigation at the scene Officer Fogley went to the jail to see the defendant. He arrived at 6:10 a.m. He fingerprinted and photographed the defendant and then performed a trace metal detection test. Before this test was made, Fogley again advised Billy of his rights. This was done in lay terms from memory without reference to the form used by the officer on other occasions. The officer explained to the defendant what the test would show. After the test was completed, Fogley told Billy that it showed a definite pattern. He also told the defendant that he had found defendant's fingerprint on some broken glass at the murder scene and asked Billy to explain the results of the test and the fingerprint. (In fact, Fogley had not found a usable print on the broken glass and if he had, it would have been of no value because Billy lived in the house.) Fogley testified that the defendant then said he didn't know what happened and asked for a cigarette. Fogley gave him a cigarette then proceeded to tell the defendant in detail what he thought had happened and why. Fogley said that prior to that time Billy had refused to tell him anything. Fogley testified that he used his "buddy-buddy" technique on the defendant, talked to him about school, hobbies and pool in order to gain his confidence. He said Billy was very distraught at the time. The evidence shows that in talking to the boy he used a technique which he described as "to love him to death," and which he said he may have called treating him like a "dutch uncle." He had also described his technique as a "con." He said he wanted Billy to feel that "it was not the most terrible, horrible thing." He referred to the statement about the fingerprint as "a ruse." Fogley testified to the following conversation with Billy:

"Now isn't that the way it happened?" and he said, "No, it's not," and he said, "What is going to happen to me?" I said, "Billy, I don't know what is going to happen to you." I said, "I can't make any promises." I said, "I would like to help you," and at that time he said, "All right, I did it, but I didn't know I did it when I was out at the house."

Fogley said that he did discuss with Billy what cooperation could mean to him. He never discussed with Billy the possible punishments for the offense and actually never mentioned punishment at all. He said that he had thereafter interrogated Billy for over an hour before he finally said he was ready to talk.

At 7:25 a.m. Officer Fogley called Sheriff Woodruff to come to the station to witness the defendant's statement. The officer testified that Billy seemed more relaxed after making the statement. The statement was recorded on a standard form ordinarily used when the subject does not wish to make a statement. The officer had filled it out early in the interview but had put it aside intending to write that the subject did not wish to make a statement at that time. After giving the statement Billy, Fogley and Woodruff went to the defendant's house, where the crime was committed, and Billy showed them two kitchen knives. The officers claim he told them he had used them in the murder, and then washed and replaced them in a kitchen drawer.

Billy testified that he had no recollection of Fogley's advising him of his rights during the morning, or of his making the statement. He did recall that he had asked that he be permitted to call his father, but that his request was denied. He also recalled Fogley reading "something off to him" and asking him "if that was right" and his answering, "Yeah." He said he could not remember what was read to him.

In determining whether the finding of the trial judge is clearly against the preponderance of the evidence, we consider many elements. Appropriate considerations to the determination are the age and intellectual strength or weakness of the defendant, the manner in which he is questioned, the presence or absence of inducements in the form of promises or favor, and deprivation of food or sleep. *Watson* v. *State*, 255 Ark. 631, 501 S.W. 2d 609; *Perkins* v. *State*, 258 Ark. 201, 523 S.W. 2d 191.

The hope of leniency excited by statements by persons in authority is also an important consideration. A confession must be free from the taint of official inducement by the

"flattery of hope," and there must be an absence of any promise of temporal reward or advantage in respect to the charge. *Greenwood* v. *State,* supra. Even though an officer makes no express promise to one from whom a confession is sought but specifically states that he has no authority to do so, when an incriminating statement is made by one who is justified in the light of all the circumstances in feeling that there was an implied promise of leniency, conditioned upon a confession, the statement must be held involuntary. *Freeman* v. *State,* 258 Ark. 617, 527 S.W. 2d 909; *Sullivan* v. *State,* 66 Ark. 506, 51 S.W. 828.

After inspiring confidence, the officer's assurance that he would like to help Billy might well have been taken by an uncounselled, sleepless, distraught youth of Billy's mentality as a promise that some advantage might be gained by confessing a crime he had been led to believe was not so serious. In view of the fact that the officer deceived Billy as to the evidence and narrated his version of how the crime was committed, it was reasonable for Billy to believe that the incriminating evidence against him was overwhelming. Fogley's assumption that Billy was guilty and his manner of letting Billy know that, including the use of a "ruse" to emphasize the belief, is significant, particularly in view of Billy's youth and mentality. *Hardin* v. *State,* 66 Ark. 53, 48 S.W. 904; *Porter* v. *State,* 206 Ark. 758, 177 S.W. 2d 408; *Brown* v. *State,* 198 Ark. 920, 132 S.W. 2d 15. See also, *Sullivan* v. *State,* supra.

In weighing the factors involved here and in determining whether, on the totality of the circumstances, the finding of the trial court must be overturned, we must not forget what we said in *Smith* v. *State,* 240 Ark. 726, 401 S.W. 2d 749, viz:

> We realize the difficulties encountered by law enforcement officers in cases of this nature, and particularly those officers who have felt it was a part of their duties to solve reported crime. However new guide lines in this field have been announced in recent years by the courts which often present borderline questions, but we feel it our duty to resolve doubtful questions in favor of individual rights and their constitutional safeguards.

Using deception to influence one in custody to make a statement is a critical matter in considering the propriety of the manner of interrogation. *Greenwood* v. *State,* supra. *Brown* v. *State,* supra. Misrepresentation of facts becomes even more significant, when it is accompanied by not only an amiable, sympathetic and paternal approach but also a constant reminder of the crime and evidence incriminating him. *Brown* v. *State,* supra. When I view the totality of the circumstances and apply the precepts of *Smith,* I can only conclude that the trial judge's finding was erroneous, because of appellant's age, his low mentality, his lack of sleep at the time, his distraught condition, the manner in which the advice of his rights was given, the technique used in obtaning the statement by inspiring a false confidence in the interrogator, the use of false statements about the results of the officer's investigation, the detailed recitation of the officer's concept of what had happened, the persuasion used to make appellant believe that the crime was not serious, and the lack of guidance or counsel, particularly in the light of the failure of the officer to inform Billy's father that the boy was suspected.

If we are ready to abandon the independent determination of voluntariness, according appropriate weight and respectful consideration to the findings of the trial judge, in favor of the substantial evidence standard, which would permit resolving all possible reasonable inferences in favor of that finding, I will not protest. See Fogleman, J., concurring, *Vault* v. *State,* 256 Ark. 343, 507 S.W. 2d 111. I do object to reaching that result by erosion.

I am authorized to state that Mr. Justice HOLT joins in this opinion.