Lee Francis HARRIS *v.* STATE of Arkansas

CR 80-183                                          648 S.W.2d 47

Supreme Court of Arkansas
Opinion delivered March 21, 1983

*William R. Simpson, Jr.,* Public Defender, and *Howard Koopman,* Chief Deputy Public Defender, by: *Carolyn P. Baker,* Deputy Public Defender, for appellant.

*Steve Clark,* Atty. Gen., by: *William C. Mann, III,* Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. Harris was convicted of attempted capital murder and sentenced to twenty-five years. On appeal we remanded the case for the trial court to make a specific finding of whether Harris' confession was voluntary. *Harris* v. *State,* 271 Ark. 568, 609 S.W.2d 48 (1980). The trial court heard additional testimony and held that the statement was voluntary and admissible.

We did not review the totality of the circumstances surrounding Harris' statement on his first appeal and must do so now. The test we apply is whether, considering the totality of the circumstances, we can say that the trial court's decision that the statement was voluntary is clearly erroneous. *Dillard* v. *State,* 275 Ark. 320, 629 S.W.2d 291 (1982); *Tucker* v. *State,* 261 Ark. 505, 549 S.W.2d 285 (1977).

Harris was certainly acting in a strange and bizarre manner the day he attempted to shoot a police officer. He had been spraying a mixture of orange juice and milk on a neighbor's yard and she called the police. Harris shot at a police officer who tried to apprehend him. After a gun battle, Harris ran and hid in his house, surrendering two hours later.

Harris was immediately taken to the police station and advised of his rights. He waived those rights in writing and thirty-five minutes later signed a short statement admitting that he tried to shoot the officer.

After entering a plea of not guilty and not guilty by reason of insanity, Harris was admitted to the Arkansas State Hospital. Thereafter Dr. W. R. Oglesby, Director of Forensic

Psychiatry Services, wrote the trial judge that Harris was unable to stand trial because of his mental state; that he suffered from a mental disease or defect to the degree that he could not cooperate in his own defense and that he did not understand the criminality of his conduct. Harris was kept at the hospital and treated and a few months later was found competent to stand trial.

Dr. Oglesby and two psychiatrists who treated Harris all gave testimony at Harris' trial and hearings that it was their unanimous conclusion that Harris was a psychotic paranoid schizophrenic and was so at the time of his arrest. Harris' mother and brother testified that Harris had been ill for several years and described some of his bizarre behavior. Harris had never in the past been treated for a mental disorder, however.

Both of the officers who were with Harris when he made his statement, and another officer who was present at Harris' arrest, testified that Harris' behavior was not unusual considering the circumstances; that he calmly acknowledged his rights, signed a waiver and answered their questions clearly and coherently. The officers said that they had been told Harris had a hearing defect, but that, otherwise, they knew of no physical or mental disorder and that he had not exhibited any signs of one. Police officers routinely deal with people who act in a bizarre manner but who are not necessarily insane.

The officers' testimony directly contradicted the medical testimony that Harris was probably not lucid enough to knowingly waive his rights and make a voluntary statement and that Harris could not rationally follow a chain of questions without incoherent or rambling answers.

There is no evidence that the officers used any force, physical or otherwise. Harris' statement was routinely transcribed and was completed within thirty-five minutes after Harris acknowledged and waived his rights.

Can we say as a matter of law that one diagnosed as a paranoid schizophrenic could not six weeks earlier have

made a voluntary statement? Must we say that lay witnesses' testimony that a person seemed normal and clearly seemed to understand questions has to be disregarded when it conflicts with medical testimony? We would have to answer both questions "yes" to reverse the trial court. Furthermore, there are few absolutes in the diagnoses of such individuals or the certainty of their condition on given days, and the medical witnesses in this case could not say more than what Harris' condition probably was the day that he was questioned. Additionally, we cannot just ignore the trial court's findings. *Degler* v. *State*, 257 Ark. 388, 517 S.W.2d 515 (1974).

This case is easily distinguishable from *Blackburn* v. *Alabama*, 361 U.S. 199 (1960), where the United States Supreme Court overturned a conviction because the appellant, a former mental patient, had confessed after being interrogated nine hours by three officers in a tiny room.

We cannot say that the evidence in this case compels a finding that the trial court's decision was clearly wrong.

Affirmed.

PURTLE and HAYS, JJ., dissent.

JOHN I. PURTLE, Justice, dissenting. In reviewing the totality of the circumstances I do not see how it could be said that the appellant was not incompetent by reason of mental disease or defect. With the exception of the officers who arrested the appellant, all other witnesses (including four psychiatrists) stated he had been acting in a strange and bizarre manner for a long time. The fact that he signed a statement has no bearing on his competency. A five year old child or a lunatic would likely sign any statement requested by an officer of the law. I doubt that we would hold such a statement to be incriminating.

It would take at least a dozen pages to enumerate all the evidence of appellant's incompetency. I will list only the most obvious testimony relating to his mental condition. He first started having delusions in 1976 when he claimed strange men came into his room and attacked him. No other

members of the family observed any intruders. He called an ambulance and had it take him to the state hospital but he returned home without treatment. During 1977 he claimed to be the owner of the rented house where he and the family lived. He refused to pay rent but tried to collect rent from the family instead. He started burning copper scouring pads on the stove in order to rid the house of odors. Although appellant was unmarried he claimed to have a wife and children. The family stated that he started talking incoherently in 1976 and continued until he was arrested for the offense for which he has been convicted which was just after spraying a neighbor's woodpile with a mixture of milk and orange juice to get rid of unwanted things. This mixture had been used by him in spraying the house where he lived to get rid of rats, varmints and unwanted people. Eventually all the members of his family moved out of the house because they were afraid of him and thought he was mentally disturbed. He kept with him a little spray bottle filled with orange juice and milk in case he needed to spray such things while he walked, obviously including the neighbor's woodpile.

The appellant exhibited typical symptoms of one suffering from paranoid schizophrenia and/or psychosis since his disability commenced in 1976. Frequently he thought people were trying to kill him and at various times felt he was working with the police and/or the FBI. In 1976 he was charged with some type of offense which required his appearance before a judge. Although the charges were dropped, the trial judge suggested that appellant seek psychiatric help. The appellant also has a severe hearing loss for which he was receiving disability payments. He sometimes wears a hearing aid for the condition, but people oftentimes have to yell to get his attention.

Officer David Sanders was called to the area of 4001 West Thirteenth Street. A Ms. Gant informed officer Sanders that a gentleman had come by her house spraying a substance in her yard and on her woodpile. Ms. Gant identified the appellant walking south on Cedar Street. He was carrying a bottle with a spout on it. Officer Sanders walked up to the appellant, who was proceeding down the

sidewalk, and stated: "I need to talk to you for a minute." The appellant looked at Sanders and continued to walk away. The officer tapped appellant's shoulder and stated: "Mister, I need to talk to you for a minute." The officer then took hold of appellant's shoulder. Appellant turned quickly to face the officer. The officer had pulled his gun and cocked it while pointing it toward appellant. The officer backed up, tripped over something and fell. As the officer was falling his gun hand was extended into the air. The appellant grabbed the officer's hand and gun at that time. The officer then pulled the trigger because he thought the appellant was trying to turn the gun on him. Appellant screamed and jumped backwards. However, during the scuffle, and after the first shot was fired, the officer dropped his weapon on the ground. By this time the appellant had pulled a gun and pointed it, "right between my eyes" according to Sanders. Appellant's weapon was then fired, the bullet grazing the officer's head. The appellant then picked up the officer's weapon " . . . stood there and looked at it, you know, like he didn't know what to do with it . . . " according to Sanders, and fired a shot at him as he was departing the scene. Immediately after this incident the appellant retreated to the confines of his home where he barricaded himself in until he was forced out by tear gas. The whole episode began when the officer approached the appellant, who was suffering from a hearing disability and at the time was merely walking down the sidewalk, demanding to talk with him. Everyone who has knowledge of people with certain mental disabilities as the ones under which appellant suffered knows that they are especially resentful of people taking hold of or touching them. There was also testimony that appellant feared someone was trying to kill him.

The appellant was subsequently sent to the Arkansas State Hospital for detention, care, and treatment. At least four psychiatrists: Dr. Hamed, Dr. Ninan, Dr. Oglesby and Dr. Whitehead were all of the opinion that appellant was suffering from mental illness, namely schizophrenia, paranoid type, to such a degree that he was unable to understand the nature of the proceedings against him, and did not have the mental ability to aid in his own defense. In other words, he was unfit to stand trial. After months of treatment

appellant was in remission. At one hearing Dr. Oglesby stated:

> And we felt that he was affected by this at the time that this incident occurred to the degree that he really couldn't appreciate the criminality of his conduct and that also he would have had impairment of his ability to conform his conduct to the requirements of the law. And he really was so confused that he didn't really know what he was charged with and it was difficult for him to communicate. So, we didn't think he was fit to proceed at the time and we requested a treatment commitment, which we got. And he was started on antipsychotic medication. And, even in the most severely disturbed psychotic, I've seen patients recover in three to four weeks completely to where you could retest and reinterview them and couldn't detect anything wrong.

There is no need for me to proceed further with the record because it is all in the same vein as that which has been discussed. The psychiatrists all agreed that it was not likely that the appellant would have had a lucid moment on the date of this regretful incident. None of the officers testified as to their opinion of appellant's mental condition except for that period of time during which the statement was written by the officers and signed by the appellant. I cannot in good consicence vote to send this man to the penitentiary for a period of 25 years instead of the Arkansas State Hospital where I think he clearly belongs. ·

I am authorized to say that HAYS, J., joins in this dissent.